**FRIENDS OF THE EARTH, INC., et al., Plaintiffs,**

v.

**Caspar W. WEINBERGER, Secretary of Defense, et al., Defendants.**

**Civ. A. No. 83–0053.**

United States District Court, District of Columbia.

April 12, 1983.

266

Nicholas Y. Yost, Katherine P. Ransel, Kenneth N. Goldenberg, Center for Law in the Public Interest, Washington, D.C., for plaintiffs.

Robert D. Daniel, James M. Spears, U.S. Dept. of Justice, Grant Reynolds, Byron D. Baur, Asst. Gen. Counsel, Secretary of the Air Force, Washington, D.C., for defendants.

Daniel J. Popeo, Paul D. Kamenar, Washington Legal Foundation, Washington, D.C., for amicus curiae.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

The plaintiffs in this proceeding are several not-for-profit public interest groups concerned with the environmental consequences of the MX missile program. The term "MX" is an acronym for "missile experimental", a reference to the new generation of intercontinental ballistic missiles. Several of the organizations have a broad base as to both membership and area of concern. Others have memberships located in the particular geographic areas and regions which are potential sites for the basing and deployment of the MX missile. Each group has a demonstrated commitment to monitor and speak out on environmental issues such as the MX program. They are accordingly involved in a variety of activities including lobbying and publication efforts.[1]

The plaintiffs allege in their complaint that Defense Secretary Caspar Weinberger and Air Force Secretary Verne Orr, the responsible Defense Department officials, have failed to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq. The gravamen of their claims is that the defendants failed to prepare an adequate environmental impact statement (EIS), a NEPA requirement, in connection with the decision in the Fall of 1982 to seek congressional approval of the closely spaced basing mode (CSB) as its preferred means of deployment for the MX. The plaintiffs seek judgment from this Court declaring that the defendants have violated NEPA and its implementing regulations. 40 C.F.R. § 1508.21. They also seek preliminary relief in the form of an order requiring the Secretaries of Defense and Air Force to prepare an environmental impact statement.

At this point in the proceedings the parties have presented to the Court for determination several motions which materially affect the course of the litigation. The defendants have moved to dismiss, asserting that because of congressional action—the Jackson Amendment (as discussed at pp. 268–273 infra)—plaintiffs' claims have been rendered moot, and their standing to pursue those claims has been eliminated, and the controversy has been transformed into a nonjusticiable political question. The motion to dismiss further alleges that the plaintiffs have failed to state a claim. The defendants have also filed a motion for summary judgment contending that the closely spaced basing proposal was not subject to NEPA but nevertheless their actions complied with NEPA.

The plaintiffs have moved for partial summary judgment embracing six of the seven claims set forth in their complaint. Those claims arise out of the defendants' alleged failure to properly study and evaluate the environmental impact of the closely spaced basing proposal by failing to prepare an appropriate EIS which includes a comparison of CSB with other alternatives and considers the worst-case possibilities of

---

1. The plaintiffs are: Friends of the Earth, Inc.; The Committee for a Sane Nuclear Policy; Council for a Livable World; Environmental Action, Inc.; Farmers Educational and Cooperative Union of America, Rocky Mountain Division; Greenpeace, U.S.A.; Nebraskans for Peace; Sierra Club; Tri-State MX Coalition; United Church of Christ; Western Solidarity; and Wyoming Church Coalition.

placing the MX in the proposed mode.[2] The plaintiffs also contend that the defendants have failed to involve the public in the NEPA process as it pertains to the selection of a basing mode.[3]

The Court has considered the various memoranda of the parties[4] and the oral argument of their counsel at a hearing recently held in this proceeding and concludes, as set forth below, that congressional action has rendered the plaintiffs' claims moot and that the case should be dismissed.

## BACKGROUND

### A. The Statutory Scheme

Section 102(2)(C) of the National Environmental Policy Act, requires that agencies include a detailed environmental impact statement with "proposals for legislation and other major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To this end, regulations have been promulgated setting forth the process for NEPA compliance. 40 C.F.R. § 1508.21. When a detailed report or EIS on the environmental consequences of a proposal is appropriate, an agency is required to commence a process called "scoping", 40 C.F.R. § 1501.4(d). Scoping is intended to determine the specific issues which should be addressed. It is undertaken with input through notice, public comment and agency responses thereto. 40 C.F.R. § 1501.7.

The NEPA process ultimately produces an impact statement which is included in the recommendation or proposal, 40 C.F.R. § 1502.5. The EIS itself is the product of several stages of preparation including compilation of a draft reflecting the results of the scoping process and a final impact statement which incorporates comments spawned by the draft and the agency's responses thereto. NEPA regulations further provide for the preparation of supplements to a draft or final EIS where the agency "makes substantial changes in the proposed action" or finds "significant new circumstances or information." 40 C.F.R. § 1502.-9(c)(1). It should be noted, however, that supplements are prepared in the same manner as a draft EIS and do not need to incorporate the formal scoping process. 40 C.F.R. § 1506.8(b).

### B. The Relevant Facts

While the government's consideration of the MX missile program reaches back to the mid-1970s, the facts which are critical to this proceeding may be briefly stated.

Plaintiffs challenge defendants' efforts to comply with their strict NEPA obligations in connection with the recent CSB basing proposal for the MX missile. The public debate over the basing issue has yielded a variety of options. Among the alternatives considered in recent years are horizontal sheltering in bunkers, vertical sheltering in underground tubes, use of slopesided pools to provide water camouflage over silos, and

**2.** The claims on which the plaintiffs seek summary judgment include: NEPA requires preparation of an EIS for CSB because MX basing is a major federal action affecting the quality of the environment and because the CSB proposal was one resulting from a statutorily required study process; the LEIS was inappropriate and inadequate; and the defendants violated NEPA's public comment requirements. ·See Complaint at ¶¶ 86–92 (filed January 12, 1983). The plaintiffs do not seek summary judgment at this point as to their seventh claim which asserts that the defendants have not complied with NEPA by failing to prepare an EIS discussing the environmental effects of the MX missile itself.

**3.** Although many of the plaintiff organizations have provided formal comment in response to

the CSB proposal and the LEIS (*see* note 7, *infra*) prepared to accompany that proposal, their claims of injury to the public's right to comment and participate extend in the broad sense to the full comment, draft EIS and final EIS process envisioned in NEPA but not applied to the LEIS process. It bears noting, however, that plaintiffs' comments on the closely spaced LEIS were forwarded to Congress along with the impact statement. *See* Plaintiffs' Memorandum In Support of Motion for Summary Judgment at p. 22 n. 15 (filed March 4, 1983).

**4.** The Washington Legal Foundation filed *amicus curiae* memoranda in support of the defendants' motion to dismiss.

horizontal concrete tube structures known as hybrid buried trench.[5] A considerable portion of the debate centers upon the survivability of a given basing concept; that is, whether the deployment of the missiles in a particular configuration will insure that a sufficient number of them can survive a nuclear exchange and remain operable to inflict defensive or retaliatory damage upon an aggressor.

Last year, after a series of exchanges with Congress over the issue, the Reagan Administration settled upon closely spaced basing as its basing preference for the MX missile. This concept contemplated placement of approximately 100 missiles in individual superhardened silos which would also operate as launchers. The silos would be located close together such that all of the missiles would be placed in an area of approximately one by 14 miles. CSB proponents allege that the configuration would result in "fratricide"—a phenomenon whereby the explosion of attacking warheads would theoretically disable or destroy other incoming missiles which followed while most of the MX missiles would remain protected through the use of reinforced or superhardened sheltering.

Although formal EISs and supplements had been prepared by the Defense Department in connection with earlier basing proposals, the Administration decided to abandon that particular practice with its CSB plan.[6] Rather, in December 1982, the Department issued an abbreviated report known as a legislative environmental impact statement (LEIS). In order to integrate NEPA into the legislative process in a manner consistent with the time demands frequently imposed by Congress, the NEPA regulations provide for preparation of an LEIS in certain situations.[7] An LEIS was formulated in response to a Senate Armed Services Committee decision deleting funds for the MX missile from the Fiscal Year 1983 Department of Defense Authorization and directing the President to notify the Committee of his choice of basing modes by December 1, 1982.

The President's CSB proposal was submitted to Congress in November 1982 in response to the congressional directive. That proposal was promptly rejected in an amendment to the Department of Defense Appropriations Act of 1983, passed as part of a continuing resolution statute signed into law on December 21, 1982. P.L. 97–377, 96 Stat. 1830 (1982).[8] The amendment,

5. Several other basing alternatives have been considered yet they received less consideration and hence did not generate a full environmental analysis. Those alternatives, rejected on grounds such as lack of sufficient survivability, impracticality or costs, included: use of existing silos for MX deployment; air mobile options incorporating aircraft; unprotected options such as launch vehicles; additional subterranean options; and interim deployment of Minuteman III missiles. See, e.g., Complaint, supra at ¶ 30.

6. Several final and supplemental EISs have been prepared in connection with the MX issue. Most importantly, an EIS entitled "MX: Milestone II" examined several basing alternatives in detail and alluded to six others. When the "Air Mobile Launch" alternative was considered, a supplement to the Milestone II EIS was prepared. None of these EISs mentioned CSB and only an LEIS was prepared on it rather than a formal EIS or supplement.

7. The NEPA regulations provide for the filing of an LEIS to accompany those "proposals for legislation" which are not requests for appropriations. 40 C.F.R. § 1506.17. Taking into

account the competing demands of congressionally imposed deadlines as opposed to the time required for preparation of a thorough environmental impact statement, the regulations provide for the submission of an LEIS up to 30 days after formal transmission of a legislative proposal. 40 C.F.R. § 1506.8(a). The regulations further provide that an LEIS shall be prepared in the same manner as a formal EIS, however, the public comment process known as "scoping" may be omitted and the LEIS may be prepared in the same fashion as a draft EIS. 40 C.F.R. § 1506.8(b). When it is transmitted, the LEIS is to be accompanied by the comments which have been received concerning the statement. See discussion of NEPA process in Part A of Background, supra.

8. The amendment was adopted by a conference committee whose report was approved by both Houses of Congress. Prior to Senate consideration, the House of Representatives had overturned a House Appropriations Committee recommendation and denied funding for MX deployment, and prohibited expenditure of research and development funds until April 30, 1983.

named after its sponsor Senator Henry Jackson, adopted a Senate Armed Services Committee recommendation and set forth a detailed response to the President's proposal. Although Congress rejected the CSB proposal, it provided funds for the MX program and hinged their availability upon congressional approval of a basing mode.

The Jackson Amendment established the procedures to be followed by the President in formulating a proposal and by the Congress in evaluating it. Specifically, the President is required to submit a report to the appropriate congressional committees which will then have 45 calendar days to reach a decision. Because of the urgency which apparently accompanies the need for a decision on the missile program, the amendment also imposes a limit on floor debate.

As for the report itself, the amendment requires that it contain either a reaffirmation of the CSB plan submitted in November 1982 or an alternative proposal. The amendment further requires that the report present "detailed technical assessments" of CSB, alternative basing systems, and the different types of intercontinental ballistic missiles which might be utilized instead of the MX. In addition, the report will provide a "comparative detailed technical assessment of alternative programs," involving different missiles and deployment schemes

> including acceleration of the Trident II program to provide target coverage equivalent of the MX missile system, enhancements and improvements to the Minuteman missile force, and development and deployment of a land-based missile system in deep underground basing, multiple protective shelters and closely spaced basing incorporating mobility and deception, a road mobile missile smaller than the MX and a common missile for land and sea deployment.

Title V, § (7)(A)(iv), P.L. 97–377, 96 Stat. 1846–48 (1982). Section (7)(B) of the amendment provides that the report shall contain:

[A]n assessment of the military capability of each alternative system or missile; an assessment of the survivability of each such system or missile against current and projected Soviet threats; an assessment of the projected cost of each such system or missile and possible upgrades thereof; an assessment of the impact each such system or missile might have on present and future arms control negotiations; an assessment of the geographic, geological, and other qualifications a site for each such system or missile would likely require; *an assessment of the environmental impact each such system of missile would likely have* and the identification of possible sites for each such system or missile. (emphasis added)

Section (7)(C) provides that "[t]he report required under [the Jackson Amendment] shall not be subject to the requirements of section 102(2)(C) of the [NEPA] relating to environmental impact statements." Section (7)(C) speaks only to the President's report as to a basing mode for the MX; once that report is submitted by the President and acted upon by Congress, the NEPA requirements would again apply in connection with the selection of an appropriate site for deployment of the missiles.

For purposes of assessing the alternatives and selecting a preference, the President has established a bipartisan Commission on Strategic Forces chaired by retired General Brent Scowcroft. The Scowcroft Commission presented its report to the President yesterday recommending the use of existing Minuteman silos rather than CSB. *See* note 12 and accompanying text, *infra.* Issuance of the President's proposal to Congress is imminent.

The plaintiffs commenced this action in mid-January seeking relief designed to remedy the defendants' alleged failure to comply with their NEPA obligations in presenting some of the MX basing proposals by requiring preparation of an EIS for use in selecting a basing mode. The plaintiffs propose that the Court direct the defendants to treat the LEIS as a draft statement and then engage in accelerated preparation of a final impact statement.

## ANALYSIS

The linchpin of the defendants' argument in support of dismissal on the ground of mootness is the effect of Congress' adoption of the Jackson Amendment. Given the general presumption against repeal by implication, the plaintiffs contend that, insofar as the defendants' NEPA obligations are concerned, the amendment provides a narrow exemption which addresses only the President's report to Congress. Reading the amendment in that fashion and noting the widely accepted policy favoring broad enforcement of NEPA's provisions, the plaintiffs argue that the amendment should not be interpreted as an immunization or erasure of prior NEPA violations. That is, the fact that Congress has suspended NEPA as to the President's impending report is not indicative of an intent to allow past infractions to go unremedied.

The defendants assert, and the Court agrees, that the amendment moots any claim as to prior NEPA violations if they indeed occurred and renders this case non-justiciable.[9] To read the amendment in any other manner would thwart Congress' intent in rejecting the November 1982 CSB proposal as presented and imposing a particular decision-making scheme upon the Executive Branch in its selection of a new basing proposal for the MX.

Through the passage of legislation which governs the lawsuit, Congress can effectively moot a controversy notwithstanding its pendency before the courts. The Supreme Court concluded in *Kremens v. Bartley*, 431 U.S. 119, 126–27, 97 S.Ct. 1709, 1713–1714, 52 L.Ed.2d 184 (1977), for example, that the interim enactment of a Pennsylvania statute establishing due process safeguards precluding the involuntary commitment of teenagers to mental institutions, mooted claims of teenagers challenging the propriety of an involuntary commitment procedure for teenagers in that state. *See also, Diffenderfer v. Central Baptist Church of Miami, Florida, Inc.*, 404 U.S. 412, 414–15, 92 S.Ct. 574, 575–576, 30 L.Ed.2d 567 (1972) (repeal of a Florida statute granting a church parking lot tax exemption which had been challenged under the Religion Clauses of the First Amendment).

In a group of cases challenging the President's impoundment of federal highway funds and the Transportation Secretary's proposed allocation of the funds in 1980, several circuit courts held that intervening congressional action rendered moot the states' challenges to the President's actions. *State of Vermont v. Goldschmidt*, 638 F.2d 482 (2d Cir.1980); *State of New Mexico v. Goldschmidt*, 629 F.2d 665 (10th Cir.1980); *State of Arkansas v. Goldschmidt*, 627 F.2d 839 (8th Cir.1980). Although the litigants in those cases had obtained preliminary injunctive relief ordering release of the impounded highway funds, the injunctions were stayed pending appeal. When Congress then took action which specifically provided for the distribution of the disputed funds, the appeal courts accordingly directed that each case be dismissed as moot.

Plaintiffs seek to distinguish the *Goldschmidt* trilogy and limit the impact of the holdings to the particular set of facts presented. The funds in the *Goldschmidt* cases, as Congress noted, were not obligated at the time the new legislation was enacted since the injunctive relief had been stayed. In addressing the funds, Congress spoke directly to the *Goldschmidt* litigation. The plaintiffs argue that the legislation in the *Goldschmidt* cases was not applied retroactively to previously-obligated funds and that the legislation here should be read

---

**9.** For the limited purpose of considering the merits of the defendants' motion to dismiss, the Court assumes plaintiffs' allegations as true and therefore accepts plaintiffs' assertion that the preparation of an LEIS rather than a supplemental EIS in connection with CSB constitutes a NEPA violation. This issue is presented in the cross motions of the parties for partial summary judgment on the part of the plaintiffs and summary judgment on the part of the defendants. Because this action should be dismissed as set forth in this Memorandum Opinion, the Court does not reach the issue of whether the preparation of an LEIS was indeed violative of NEPA.

Similarly, although the issues are intertwined with mootness, the Court does not address the questions of standing and political question.

similarly. The NEPA exemption provided by Congress, they assert, only addresses the President's report and therefore does not embrace the earlier NEPA violations.

Plaintiffs' claims to the contrary notwithstanding, the *Goldschmidt* cases provide considerable guidance. The Jackson Amendment's three critical provisions operate to (1) reject the President's November 1982 CSB proposal,[10] (2) establish the process and deadlines governing formulation of a new proposal, and (3) establish guidelines for assessing the environmental aspects of that decision. With regard to the *Goldschmidt* litigation, the Eighth Circuit noted:

> Congress has left little room for interpretation. The new Act plainly does at least three things. (1) It disapproves the President's deferral message .... The issue of the propriety of the deferral under the Impoundment Control Act, though still of legal interest has therefore disappeared from this case for all practical purposes. (2) The Act sets a new obligational ceiling for FY 1980 ... for federal aid highways and highway safety construction programs, almost as low as the ... ceiling that would have been imposed by the deferral. And (3) the Act specifies a formula for allocation of remaining FY 1980 funds.

627 F.2d at 841. The subsequent congressional action eliminated any dispute as to the President's prior actions thus, relying upon *Kremens v. Bartley*, 431 U.S. at 128–29, 97 S.Ct. at 1714–1715, the court concluded that the "new Act cuts the basis from under the controversy ... making it purely academic and therefore moot." 627 F.2d at 842; *accord State of Vermont v. Goldschmidt*, 638 F.2d at 485; *State of New Mexico v. Goldschmidt*, 629 F.2d at 668–69. The same is true here.

■ Although courts are reluctant to find repeal by implication based upon congressional appropriations action, *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299–2300, 57 L.Ed.2d 117 (1978), "when Congress desires to suspend or repeal a statute in force, '[t]here can be no doubt that ... it could accomplish its purpose by an amendment to an appropriation bill, or otherwise.'" *United States v. Will*, 449 U.S. 200, 222, 101 S.Ct. 471, 484, 66 L.Ed.2d 392 (1980), *quoting United States v. Dickerson*, 310 U.S. 554, 555, 60 S.Ct. 1034, 1035, 84 L.Ed. 1356 (1940). Balancing these competing concerns requires inquiry into congressional intent to determine whether the two statutory provisions at issue are contradictory. *United States v. Will*, 449 U.S. at 222, 101 S.Ct. at 484; *Demby v. Schweiker*, 671 F.2d 507, 509 (D.C.Cir.1981).

To be sure, Congress can and does exempt projects from NEPA. *Flint Ridge Development Co. v. Scenic Rivers Association of Oklahoma*, 426 U.S. 776, 788, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205 (1976); *Izaak Walton League of American v. Marsh*, 655 F.2d 346, 367–68 (D.C.Cir.), *cert. denied sub nom. Atchison, Topeka and Santa Fe R.R.*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981).[11] Yet NEPA's "deliberate com-

---

**10.** In the *Goldschmidt* litigation, it should be noted, although Congress disapproved the President's actions, it nevertheless set up a distribution scheme similar to that which the President envisioned. Congress rejected the President's approach to the distribution of highway funds but adopted a scheme which bore striking similarities to the President's.

**11.** As a point of comparison, Congress has expressly exempted a project such as the Trans-Alaska Pipeline from NEPA with the following specific language:

> The actions taken pursuant to this chapter which relate to the construction and completion of the pipeline system ... shall be taken without further action under the National Environmental Policy Act of 1969; and the ac-

tions of the Federal officers concerning ... authorizations for construction and initial operation at full capacity of said pipeline system shall not be subject to judicial review under any law except that claims alleging the invalidity of this section may be brought within sixty days following November 16, 1973, and claims alleging that an action will deny rights under the Constitution of the United States, or that the action is beyond the scope of authority conferred by this chapter, may be brought within sixty days following the date of such action. 43 U.S.C. 1652(d)

*See Izaak Walton League of America*, 655 F.2d at 367–68, noting in reference to the above-quoted language: "Congress has shown that it

mand" that federal agencies comply with the Act's requirements, *Flint Ridge*, 426 U.S. at 787, 96 S.Ct. at 2437, assures that courts will not regard congressional action as exemptive without strong supporting evidence. As the Court of Appeals for this Circuit has stated:

> Given Congress' clearly expressed desire to ensure that all government actions are taken in accordance with NEPA, and its ability to expressly override the requirements of the Act ... even when substantive legislation is involved, repeal by implication should be found only in the rarest of circumstances. Absent very strong evidence in the legislative history demonstrating a congressional desire to repeal NEPA, or a direct contradiction between that Act and the new legislation, claims under NEPA should be reviewed.

*Izaak Walton League of America,* 655 F.2d at 367 (citations omitted).

■ By rejecting the President's November 1982 CSB proposal but earmarking funds for the MX whose availability turns on congressional approval of a basing mode, Congress has set the stage for consideration anew. Tying access to the funds to approval of a basing mode, the Jackson Amendment clearly delineates the decision-making process to be incorporated in selecting an appropriate basing mode. Any basing selection which the Reagan Administration advances will necessarily be developed and then presented to Congress according to the amendment. Even if the Administration elects to resurrect CSB [12] the amendment specifically requires that the report reaffirm that position. Moreover, the sparse legislative history [13] does not support the plaintiffs, although it is fully consistent with the government's position that the Jackson Amendment completely proscribed the process by which the basing proposal would be constructed, presented, and reviewed. The clear import of that comprehensive legislative package is that Congress has refused all prior basing proposals and determined that it will not consider the matter until the President submits his report and indicates his preference therein. In any event, Congress has dictated the manner in which it is to receive and consider the new proposal as well as the composition of the proposal.

The plaintiffs ascribe a much narrower intent to Congress' adoption of the Jackson Amendment, arguing that it is forward-looking and emphasizing that it provides a narrow NEPA exemption which embraces only the President's impending report. They point out that CSB is a viable proposal since it may be resubmitted and they assert that Congress acted under the assumption that the defendants had already complied with NEPA. They further note that although Congress explicitly suspended NEPA as to the compilation of the President's report, it could have exempted prior proposals in equally explicit language yet it

is fully capable of expressing its desire to exempt projects from NEPA."

12. Clearly, the Jackson Amendment leaves the option open. The administration can propose CSB or a variant again or it can seek approval of another basing alternative. If CSB is abandoned however, then that decision would seem to moot the issue. *See, e.g., Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981) (recognizing that NEPA does not require preparation of a hypothetical EIS for projects which are not actual proposals).

13. The plaintiffs question the weight which should be accorded the comments of the Senators, noting that they occurred after passage of the Jackson Amendment and addressed an amendment of Senator Hart, and that Senator Jackson did not participate in the debate. *See* Transcript, *supra* at 62–63. Plaintiffs' assertions, however, ignore the full nature of the colloquoy; while occurring a day after passage of the Jackson Amendment, they are clearly addressed to its effect as understood by the Senators who engaged in the colloquoy. Though Senator Jackson did not participate in the exchange, one senator who did was the Chairman of the Senate Armed Services Committee (Senator Tower) and another was the Chairman Senate Appropriations Defense Subcommittee. Whether Senator Hart's inquiry was concerned, as plaintiffs contend, with the necessity of his proposed amendment (requiring NEPA compliance as to subsequent site consideration), it is clear that the comments are addressed to the effect of the Jackson Amendment.

did not elect to do so. In support of their interpretation, plaintiffs quote Senator Stevens, Chairman of the Senate Appropriations Defense Subcommittee, who responded to an inquiry of Senator Gary Hart one day after the Senate adopted the Jackson Amendment. Senator Hart, a member of the Armed Services Committee, questioned whether the amendment would limit the application of NEPA to "actual deployment" and Senator Stevens responded:

> I would say that the intent, as I understand it, was to make certain that the President's recommendation to Congress is not under the NEPA requirement, but *we did not attempt to remove anything else but for that language.*

128 Cong.Rec. S15166 (daily ed. December 16, 1982) (emphasis added).

Although the plaintiffs place considerable reliance upon the Stevens quote, the context of the colloquy and the clear effect of the Jackson Amendment are fatal to the plaintiffs' interpretation. Senator Stevens' comment addressed an inquiry into whether the Jackson Amendment's NEPA exemption was indeed limited to the President's report or whether it might extend to the subsequent decision-making process for selection of an actual basing *site* once a *mode* is approved for deployment. As the remarks clearly indicate, the Senators who spoke to the issue were concerned with limiting the NEPA exemption to the President's report on basing modes rather than subsequent consideration of actual siting. Moreover, the Senators' remarks demonstrate an understanding that the process whereby the President's report would be compiled and submitted would encompass and subsume all further consideration as to a basing mode:

> Mr. HART ... may I ask the ... chairman of the Armed Services Committee whether ... [the Jackson Amendment] in any way restricts or limits the effects of the so-called NEPA process ... on actual deployment?
>
> Mr. TOWER ... [I]t does not and once a site is selected the provisions of NEPA would be fully complied with.
>
> ... [an inquiry by Senator Hart and Senator Steven's response as quoted above at p. 18] ...
>
> Mr. HART. Well, that is my understanding and in the process of looking at alternative basing modes that each of those does not have to comply with it.
>
> Mr. STEVENS. That is right.
>
> Mr. TOWER. Obviously, any mode recommended to Congress which it authorized would be subject to NEPA.

128 Cong.Rec., *supra* at S15166.[14]

In conclusion, Congress can suspend NEPA obligations and it has done so here. The manner in which it has responded to the President's November 1982 CSB proposal indicates its desire to redefine the process by which the President will develop and submit a proposal for the MX basing mode. That newly defined process effectively moots any claim that the plaintiffs may have had as to prior NEPA violations by the defendant since those transgressions, if they occurred, were engaged in with regard to matters which are no longer pending before Congress in their prior form. Congress has dictated the manner in which the MX basing proposal will be devised and considered and that process is exempt from NEPA.

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss is granted and the complaint is dismissed with prejudice. An

---

14. Consistent with the Court's interpretation of Senator Steven's remarks concerning the Jackson Amendment is a letter authored by the Senator and sent to defendant Verne Orr:

> You may recall the Congress, during the deliberations on the fiscal year 1982 appropriation, questioned the prudence of expending funds for such environmental analyses in the absence of an approved basing mode. Given the uncertainties that still exist on the selection of a basing mode, I do not believe the Air Force should pursue any environmental studies on any specific site or basing plan until a basing mode is approved by the Congress.

Exhibit A to Reply Memorandum In Support of Defendants' Motion to Dismiss (filed March 1, 1983).

appropriate Order accompanies this Memorandum Opinion.