**DAINGERFIELD ISLAND
PROTECTIVE SOCIETY,
et al., Plaintiffs,**

v.

**Donald P. HODEL, Secretary, U.S.
Department of Interior, et al.,
Defendants.**

**Civ. A. No. 86–2396.**

United States District Court,
District of Columbia.

April 11, 1989.

Catherine A. Cotter, Washington, D.C., for plaintiffs.

Mark Nagle, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Three citizens groups, Daingerfield Island Protective Society ("DIPS"), Save the George Washington Parkway, Northeast Citizens Association, and three individuals bring this action against the Secretary and Assistant Secretary of the United States Department of Interior ("the Secretary"), certain named officials of the National Park Service, and the National Capital Planning Commission. Plaintiffs seek to set aside a 1970 Land Exchange Agreement, under which the United States Government acquired title to certain wetlands, known as Dyke Marsh located along the shores of the Potomac River between Alexandria and Mount Vernon, in exchange for granting the former owner of the wetlands an easement over the George Washington Memorial Parkway near Daingerfield Island to construct an interchange providing access to and from a parcel of land referred to as Potomac Greens. Plaintiffs also seek to void the approval of the interchange design granted by the National Park Service in 1981 and the National Capital Planning Commission in 1983. On November 26, 1986, Richmond, Fredericksburg and Potomac Railroad Company ("RF & P"), the owner of Potomac Greens, and Potomac Greens Associates Partnership were granted leave to intervene as defendants.

Plaintiffs contend that the departmental decisions that led to the execution of the Exchange Agreement and approval of the interchange violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., as well as numerous other statutes.

*Background*

On June 5, 1970, Secretary of the Interior Walter Hickel signed a Land Exchange Agreement (hereinafter sometimes "Exchange Agreement"), under which the United States would receive title to a 28.8–acre tract of land known as Dyke Marsh[1] in exchange for an easement over the George Washington Memorial Parkway near Daingerfield Island to construct a traffic interchange.[2] As stated previously, the traffic interchange is intended to provide access over the George Washington Parkway to a 38.5–acre parcel of land referred to as Potomac Greens (or Potomac Center) located across the Parkway from Daingerfield Island.[3]

---

1. Dyke Marsh is located on the western shore of the Potomac River in Fairfax County, Virginia.

2. The Fairchilds, Fairchild & Company, RF & P and the United States were parties to the Exchange Agreement. RF & P, which also owned the nearby railroad yards, contemporaneously with the execution of the Exchange Agreement, executed a long-term lease of this property to Fairchild & Company to develop this property. The ultimate purpose of plaintiffs is to prevent the development of this 38.5–acre parcel.

3. The Exchange Agreement specifically provides that:

[t]he United States will deed, grant, and/or issue such easements or other interests in land of the United States as may be necessary to establish adequate perpetual access to ingress and egress from the Parkway to the Potomac Center tract....

Exchange Agreement ¶ 1, Admin.Rec. at Tab 22. The Exchange Agreement further provides that:

this agreement to exchange shall become effective upon execution by all of the parties hereto and delivery to the United States of America and its assigns of a proper deed of conveyance to Dyke's Marsh.... It is likewise agreed that the delivery of such deed by Fairchild to the United States shall entitle Fairchild and the railroad [RF & P], their successors or assigns ... to the deed, grant and/or issuance of such necessary rights for access as stated herein from the United States....

*Id.* ¶ 12. Moreover, the parties agreed that:

all plans for the construction of the bridge and related approaches, ramps, and connections are to be approved by the National Park Service, the National Capital Planning Commission, and the Fine Arts Commission....

One year later, on June 6, 1971, the other parties to the agreement, RF & P and Fairchild & Company, Inc. (hereinafter "Fairchild"), the leasee of RF & P, executed the Exchange Agreement. *See* Exchange Agreement, Admin.Rec. Tab 22 at 107–08; Federal Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment ("Federal Defendants' Motion to Dismiss") at 10.

Pursuant to the Agreement, the United States obtained title to Dyke Marsh by Warranty Deed dated June 30, 1971. *See* Warranty Deed, Admin.Rec. at Tab 30.[4]

*Environmental Reviews*

There have been numerous environmental reviews over the past nearly two decades. On May 13, 1970, prior to the approval of the land exchange by the Secretary of Interior, the Associate Director for Professional Services of the National Park Service prepared a memorandum entitled "Environmental Factors, Dyke Marsh–Potomac Center Project," which concluded:

> there would be minimal adverse environmental import [sic] by reason of granting access to the George Washington Memorial Parkway, and there would be some environmental benefits by reason of Federal ownership of an additional portion of Dyke Marsh.
>
> The proposed agreement is in the public interest and should be concluded.

Admin.Rec. Tab 21 at 97.

In 1976, the National Capital Region of the National Park Service prepared a draft environmental assessment regarding granting the access rights over the Parkway. *See* "Potomac Center Access, Environmental Assessment, Mount Vernon Memorial Parkway" (August 1976), Admin.Rec. at Tab 55. After reviewing aesthetic and traffic considerations of various alternative approaches[5] to granting the access rights, this environmental assessment concluded that conveying access rights to the Parkway from Potomac Center would have a detrimental environmental impact and that the access rights should not be granted. *See id.,* Tab 55 at 492. This 1976 environmental assessment was never adopted as final, however, because the National Capital Region was informed by its counsel that, under the Exchange Agreement, it was bound by the terms of the Exchange and could not refuse to convey access rights to the developer. *See* Admin.Rec. at Tabs 54, 58. The 1976 environmental assessment thereafter became a working paper for the Regional Director's recommendation that the access rights be purchased back from the developer. *See* Admin.Rec. at Tab 58. However, the National Park Service never adopted the Regional Director's recommendation that the access rights be repurchased for the likely reason that funds were not available.

In 1978, two of the plaintiffs in the instant proceeding, DIPS and Kenneth Williams, brought suit against the Department of Interior seeking to enjoin the Department from considering approving the interchange design of the access over the Parkway until an Environmental Impact Statement had been prepared. The District Court dismissed the case as premature because the National Park Service had not acted upon any proposal for the interchange design. *See Daingerfield Island Protective Society v. Andrus,* 458 F.Supp. 961 (D.D.C.1978); Plaintiffs did not challenge the validity of the Exchange Agreement which at the time had been in existence for seven years.

On April 13, 1981 the National Park Service approved the traffic interchange de-

---

*Id.* ¶ 11.

**4.** The United States, although at all times obligated since the execution of the Exchange Agreement in 1971, did not convey a deed of easement granting right of access over the Parkway to RF & P until August 1984. *See* Admin. Rec. at Tab 159.

**5.** The two basic alternatives considered were a) granting access to the Parkway to serve the proposed Potomac Center, and b) not granting access to the Parkway, with the existing access to Daingerfield Island to be maintained and the Potomac Center not built. Additional alternatives included considering the effects of various levels of development of the Potomac Center tract as well as constructing the Potomac Center without access to the Parkway. *See* Admin. Rec., Tab 57 at 485.

sign. *See* Admin.Rec., Tab 115 at 775. The Park Service retained the right to make additional changes to the project, noting that RF & P still needed specific construction permits before it could begin work on the interchange. *See* Admin.Rec. at Tabs 68, 124.

In October of 1983 the National Park Service completed an environmental assessment ("EA") of the design of the proposed interchange. *See* "Environmental/Design Assessment, Crossing of George Washington Memorial Parkway at Daingerfield Island" (October 1983), Admin.Rec. at Tab 148. Because it was believed that the Park Service was legally obligated under the Exchange Agreement to grant the access rights, the EA did not consider the alternative of not granting the access rights. *See id.*, Tab 148 at 806.

The Commission of Fine Arts had previously approved the design of the proposed interchange on April 19, 1983, *see* Admin. Rec. at Tab 131;[6] the National Capital Planning Commission approved the interchange on November 3, 1983, *see* Admin. Rec. at Tab 153.

In 1982, the Fairchilds sued to rescind the Exchange Agreement for lack of consideration. After this suit was dismissed on jurisdictional grounds, the Fourth Circuit Court of Appeals reversed. Upon remand, Judge Bryan of the United States District Court, in a lengthy opinion, denied the Fairchilds' claim to rescind, holding that "the railroad would be prejudiced if rescission were granted, in the light of the delay caused by plaintiffs' [Fairchilds'] con-

duct". *Fairchild v. United States*, No. 82–71–A, slip op. at 14 (E.D.Va. June 4, 1984) *aff'd*, No. 84–1854, slip op. (4th Cir. Aug. 22, 1985). In reaching his decision, Judge Bryan of necessity had to assume the continuing validity of the Exchange Agreement then almost thirteen (13) years old.

In August of 1984, the United States conveyed to RF & P[7] a deed of easement, which granted the railroad a perpetual easement across the parkway. *See* Admin. Rec. at Tab 159. No construction permits have been approved for the interchange.

*Present Posture*

On August 27, 1986, plaintiffs in a lengthy complaint (later amended on February 20, 1987) commenced the instant action. They allege that the Secretary's approval of the Land Exchange Agreement in June of 1970 and the National Park Service's subsequent approval of the interchange design in 1981 violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.;* the National Capital Planning Act, 40 U.S.C. § 71 *et seq.;* the Capper–Cramton Act, 46 Stat. 482; the Mount Vernon Highway Act, 45 Stat. 721; the National Park Service Organic Act, 16 U.S.C. § 1 *et seq.;* the Land and Water Conservation Fund Act, 16 U.S.C. § 460*l* –22(b); the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.;* and Executive Order No. 11,988 concerning floodplain areas.

*The Position of Defendants*

■ Defendants raise three threshold defenses against plaintiffs' claims.[8] First

---

**6.** Plaintiffs do not challenge the Commission of Fine Arts' approval of the interchange.

**7.** The deed was conveyed to RF & P rather than Fairchild, the former owner of Dyke Marsh, because RF & P had terminated Fairchild's lease of the Potomac Center tract in January of 1982, and RF & P had assumed all rights granted to Fairchild. *See* Admin.Rec. at Tab 118. The lease was terminated because of Fairchild's failure to obtain the necessary site plan approval, rezoning and building permits to complete approval by a scheduled date and to contract for access bridge ramps and connections. Under the terms of the lease, RF & P succeeded to the rights of Fairchild.

**8.** The Intervenor Defendants additionally assert that DIPS lacks standing to challenge the National Park Service's approval of the interchange design because it failed to allege an injury causally related to the challenged action. *See* Intervenors' Memorandum in Support of Motion to Dismiss or for Summary Judgement ("Intervenors' Brief") at 25–29. DIPS has alleged that its members live within a mile or two of the easement and the Potomac Greens site, travel on the Parkway over which the easement was granted with great frequency, and use Daingerfield Island for recreation. *See* Amended Complaint ¶¶ 4–7, 12–15. These allegations comport with the standard set forth in *Sierra Club v. Morton*, 405 U.S. 727, 738, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972) (stating that stand-

and foremost, they assert that plaintiffs' claims are barred by the doctrine of laches. Second, defendants argue that those counts [9] of the Amended Complaint asserting violations of the Land and Water Fund Conservation Act, the National Park Service Organic Act, the Mount Vernon Memorial Highway Act, the Capper–Cramton Act, the National Capital Planning Act, and Executive Order No. 11,988 cannot be enforced by plaintiffs because none of these statutes or the Executive Order give rise to a private cause of action. Finally, they argue that count I of the Complaint (violations of NEPA) is moot since Congress enacted legislation requiring the Park Service to prepare an EIS on the traffic impact of the Potomac Greens development.

### A. The Defense of Laches

■ Defendants assert that plaintiffs' challenges to the Secretary's 1970 approval of the Land Exchange Agreement and the National Park Service's 1981 approval of the interchange design are barred by laches, plaintiffs' complaint having been filed 16 and 5 years after the challenged actions respectively. Although laches is a disfavored defense in environmental suits, see Coalition on Sensible Transportation, Inc. v. Dole, 642 F.Supp. 573, 588 n. 5 (D.D.C.1986), it is nevertheless well settled that, under the appropriate circumstances, this equitable doctrine applies to environmental litigation. See, e.g., Ecology Center of Louisiana, Inc. v. Coleman, 515

F.2d 860, 867 (5th Cir.1975), Peshlakai v. Duncan, 476 F.Supp. 1247, 1256 (D.D.C. 1979). As with other types of litigation, the party asserting a laches defense bears the burden of proving 1) unreasonable delay by the plaintiffs in asserting a claim, and 2) undue prejudice as a result of the delay. Id.

Furthermore, for the purpose of this discussion, we confine the defendants' assertion of laches as going to the plaintiffs' failure to challenge the Land Exchange Agreement for over fifteen years. We reserve for separate consideration that aspect of plaintiffs' complaint which challenges the approval of the interchange design.

#### 1. Unreasonable delay

Plaintiffs challenge the agency action consisting of the Secretary's approval of the Land Exchange Agreement in which the United States acquired 28.5 acres of wetlands destined for development in return for a right of access over the Parkway. Plaintiffs argue that the Land Exchange Agreement is invalid because the Secretary failed to comply with various statutory requirements prior to approving the land exchange.[10] Thus, plaintiffs' complaint was filed 16 years after the Secretary's approval of the land exchange and 15 years after the Exchange Agreement, which plaintiffs now seek to have invalidated, took effect.[11]

---

ing can be grounded on aesthetic and environmental wellbeing). We find that the allegations are sufficient to establish that the members' use and enjoyment of Daingerfield Island, the Parkway and the streets on which they reside are likely to be injured by the agency's approval of the interchange design. We conclude that DIPS' alleged injury is traceable to the challenged action, that a favorable decision would likely provide redress, and that DIPS therefore has standing to pursue this claim. See International Union of Bricklayers v. Meese, 761 F.2d 798, 802 (D.C.Cir.1985).

9. The Federal defendants argue that counts III (Mount Vernon Highway Act and Capper–Cramton Act), V (National Capital Planning Act), VII (National Capital Planning Act), and VIII (Executive Order No. 11,988 and Floodplain Management Guidelines of the United States Water Resources Council) cannot be enforced by plain-

tiffs. See Federal Defendants' Motion to Dismiss at 23–29. The Intervenor Defendants join in these arguments and additionally assert that count II (Land and Water Conservation Fund Act) cannot be enforced by plaintiffs. See Intervenors' Brief at 15–25.

10. In considering the defense of laches, we must point out that the Land Exchange Agreement was, in fact, entered into more than 15 years ago and, despite this fact, the plaintiffs waited until 1986 before challenging this Agreement. It is undisputed that plaintiffs were at all times upon notice of this fact from the extensive press coverage in the Alexandria and Washington media.

11. Plaintiffs acknowledge that the land exchange was first approved by the Secretary in June of 1970. Plaintiffs' Memorandum at 1. That the railroad did not obtain a deed of ease-

■ We have no difficulty in concluding that plaintiffs 16–year delay in bringing their claims challenging the validity of the Exchange Agreement was clearly excessive. Whether a delay in bringing suit is unreasonable also depends on a number of additional factors, including whether the plaintiff has expressed early opposition to the challenged agency action, the nature of the agency's response, and the extent of actions, such as preparatory construction, that tend to motivate citizens to investigate legal bases for challenging the agency action. *See Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 854 (9th Cir.1982). All of these add up to excuses offered by plaintiffs for their inaction.

■ Plaintiffs do not contend that they were unaware of the Secretary's approval of the land exchange.[12] Rather, they argue that the 16 year delay in asserting their challenge to the Exchange Agreement should be excused because the United States did not convey an easement over the Parkway until 1984 and that, for a number of years, the Regional Director of the National Park Service recommended that the easement be repurchased. We note that only one plaintiff, Northeast Citizens Association, voiced opposition to the land exchange itself prior to instituting the instant suit.[13] We find this excuse to be without merit.

The record reflects that beginning in 1976, the Regional Director of the National Park Service recommended that the access rights be repurchased. *See* Admin.Rec. at Tabs 56, 162. However, the National Park Service never adopted this recommendation. At the same time, the Service made efforts to obtain more concrete plans for the proposed Potomac Center development and interchange in order to facilitate re-

view of the construction plan and minimize the environmental impact before approving the access rights in 1984. *See* Admin.Rec. at Tabs 67, 69, 70, 77, 80, 92, 93.

Although it is clear that the Park Service considered repurchasing the access rights, the record also demonstrates that the Park Service, nevertheless, at all times, treated the Agreement as binding. The fact the Park Service considered, among its various options, repurchasing the access rights provides no excuse for plaintiffs' 15–year delay in challenging the validity of the Agreement. In delaying instituting action on the Agreement, plaintiffs ran the risk that the agency ultimately would not approve repurchasing the access rights. This is, in fact, exactly what occurred in the instant case. The mere hope that the agency would someday repurchase the access rights that the agency bound itself to convey as early as 1971, is not sufficient justification for plaintiffs' failure to act.

■ It is also of no help to plaintiffs that an action brought by two of the plaintiffs now before us in 1978 was held to be premature. As previously mentioned, that suit, decided by Judge Gasch of this Court, did not challenge the validity of the Exchange Agreement itself. Rather that proceeding sought only to enjoin the defendants from acting on an *application for approval of construction plans for the traffic interchange* until the defendants complied with the procedural requirements of NEPA. That action did not seek to have the Agreement itself invalidated. That issue was ripe for judicial review at that time, since the approval took place in 1970. Instead, plaintiffs slept on their rights and chose not to press their claims regarding the validity of the Exchange Agreement

ment over the Parkway until 1984 is of no consequence to plaintiffs' challenge to the Land Exchange Agreement itself since it is the *approval* of the land exchange, which unquestionably took place in June of 1970, to which plaintiff objects. Additionally, by its terms, the Exchange Agreement became effective in 1971 when it was executed by all the parties and when the Dyke Marsh was conveyed to the United States. *See* Exchange Agreement ¶ 12, Admin.Rec. at Tab 22.

12. Plaintiffs made known their opposition to the granting of access rights over the Parkway as early as 1970.

13. Plaintiff Northeast Citizens Association alone protested the land exchange and requested hearings in 1970, before Secretary Hickel signed the Exchange Agreement. *See* Amended Complaint, Ex. G.

until 1986, 16 years after the agency action which they now challenge.

### 2. Undue prejudice

■ Plaintiffs argue that setting aside the Exchange Agreement at this late date would still be efficacious, since no construction activities on the interchange have begun and the natural environment in that area remains undisturbed. However, plaintiffs completely ignore the other half of the Exchange Agreement: the United States acquisition of ownership of Dyke Marsh. Even though there has been no preparatory construction on the site of the traffic interchange, we cannot overlook or turn our back to the environmental importance of the wetlands having been placed under government ownership since 1971. It is singularly ironic that plaintiffs dedicated to the preservation of environmental values should pay no attention to these factors.

Dyke Marsh is a particularly delicate wetlands area, the development of which would have been environmentally disastrous. *See* Admin.Rec. at Tab 21. These wetlands have become an integral part of the National Park System which the public has been able to enjoy for almost 20 years. Their acquisition protected the environmental integrity of over 400 acres of abutting wetlands already owned by the United States. Setting aside the Exchange Agreement at this late date would terminate a right the public has enjoyed for almost a decade: the right to continued enjoyment of the wetlands in their pristine state. "Laches does serve other purposes collaterally, if not directly, including minimizing the disruption and expense caused by

granting certain relief." *Powell v. Zuckert,* 366 F.2d 634, 638 (D.C.Cir.1966).

Additional factors to be weighed in determining the existence of undue prejudice include the level of time and resources already committed to a project by the defendants and the degree to which project construction has progressed. Although we do not view this time and expense standing alone or the degree of development at the interchange site [14] to rise to the requisite level of prejudice that would justify application of the laches doctrine, we do conclude that they in combination with the prejudice to the public that would ensue from depriving the public of the continued enjoyment of the wetlands constitutes sufficient prejudice to the government to invoke the defense of laches.

We accordingly hold that this doctrine of repose is especially applicable to the facts herein and that plaintiffs are barred by laches from presenting their challenge to the validity of the Exchange Agreement.[15]

### B. *The Issue of Mootness*

■ Entirely apart from plaintiffs' challenge to the Land Exchange Agreement, which we preclude on grounds of laches, there remains the separate issue of the approval by the National Park Service in 1981 of the interchange design. Plaintiffs claim that this approval violated NEPA because no EA or EIS was prepared and no public participation or interagency consultation occurred prior to said approval. Plaintiffs further seek to have this Court order the Park Service to prepare an EIS or a supplemental EA on the entire transaction including the interchange design.

On December 21, 1987, Congress enacted

---

**14.** The Federal defendants argue that "considerable," although unspecified, sums have been spent by the government in negotiating the original Exchange Agreement and in carrying out its obligations under the Agreement, including commissioning numerous traffic reports and environmental studies. In addition, the Intervenor defendants estimate that more than 2.5 million has been expended in development costs in reliance on the validity of the Exchange Agreement and approval of the interchange design. As stated previously, construction on the project has not begun; the National Park Service is presently precluded from approving any construction permit before the congressionally mandated EIS is prepared and reviewed.

**15.** In view of this disposition, it is not necessary to decide the claims asserted in Counts II, III, IV, V, VII and VIII. Defendants contend that the statutes and Executive Order on which these claims rest do not provide for a private cause of action. Defendants' position is not without substantial merit.

legislation[16] requiring the National Park Service to prepare an EIS for the Potomac Greens site. The Act precludes the Park Service from awarding a construction permit for the Potomac Greens interchange until it has prepared an EIS that reviews:

the traffic impact of *only* the proposed 38-acre development opposite Daingerfield Island west of the George Washington Memorial Parkway ... [and] *the impact* of the planned development on the visual, recreational and historical integrity of the Parkway. *Id.* (Emphasis supplied.)

The Act further states:

The [EIS] shall also provide an evaluation of the alternative acquisition strategies to include but not be limited to appraisal estimates for the access rights, the entire 38-acre parcel, that portion of the 38-acre parcel as defined approximately by the historic boundary line, and any other recommendations by the Park Service to mitigate the Parkway degradation effects of the proposed development so as to adequately protect and preserve the Parkway.

Of critical importance is the provision of the legislation which reads:

The National Park Service *solely* shall determine the legal and factual sufficiency of the [EIS] and its compliance with the National Environmental Policy Act of 1969.

The [EIS] shall be *separate from, independent of, and in no way intended to affect or modify any pending litigation.* Notwithstanding any other provision of law, *no court shall have jurisdiction to consider questions respecting the factual and legal sufficiency of the [EIS] under the National Environmental Policy Act of 1969.*

*Id.* (Emphasis supplied.)

In summary, Congress has required the National Park Service to conduct a new EIS regardless of prior environmental reviews. This, of course, is the relief which plaintiffs seek from this Court. At the same time, the Act provided that this new EIS will be independent of and will not affect any pending litigation and that no court shall have jurisdiction to consider questions of the factual and legal sufficiency of the EIS under NEPA.

Based on the foregoing, plaintiffs now request that we stay consideration of Count I of the complaint pending completion of the EIS mandated by the legislation. Defendants, on the other hand, respond that this same legislation renders plaintiffs' claims under NEPA moot. We agree.

This is not the first time that pending litigation has been overtaken by subsequent litigation. In a similar case, Judge Parker of this Court dismissed a NEPA suit on the grounds of later-enacted Congressional legislation in *Friends of the Earth, Inc. v. Weinberger,* 562 F.Supp. 265 (D.D.C.1983). There, the plaintiffs alleged that the Department of Defense had failed to comply with the National Environmental Policy Act in connection with a decision to seek congressional approval of a method of deployment of the MX missile system. *See id.* 562 F.Supp. at 266.

Subsequently, Congress, as part of a continuing appropriations resolution (just as here), established procedures to be followed by the President in formulating a proposal for basing the missile systems and for an evaluation by the Congress. The government moved to dismiss on the ground that the legislation, termed the Jackson Amendment, precluded the necessity for review of the earlier-conducted environmental review. Judge Parker agreed, first ruling:

Through the passage of legislation which governs the lawsuit, Congress can effectively moot a controversy notwithstanding its pendency before the courts.

*Id.* 562 F.Supp. at 270.

Here, Congress has required the National Park Service to conduct a new EIS regardless of the prior environmental reviews and has deprived this Court of fur-

---

**16.** *See* Continuing Appropriations Act, H.J.Res. 395, 100th Cong., 1st Sess., 133 Cong.Rec. 12,458 (1987).

ther jurisdiction. In seeking a stay, plaintiffs have expressly taken the position that the congressionally-required EIS provides the relief they seek from this Court. That being the case, plaintiffs' motion, in effect, urges upon the Court that there is no longer any justiciable controversy for this Court to consider. The issue has been rendered moot. *See also Associated Third Class Mail Users v. United States Postal Service,* 662 F.2d 767 (D.C.Cir.1980); *National Health Agencies' Committee for the Combined Federal Campaign v. Devine,* 564 F.Supp. 904 (D.D.C.1983).

## CONCLUSION

For the reasons set forth, the plaintiffs' claims which challenged the validity of the Land Exchange Agreement of 1971 are dismissed on grounds of laches. Plaintiffs' similar claim which questions the interchange design approved by the National Park Service in 1981 is dismissed because it has been mooted by the Continuing Appropriations Act of 1987.

An Order consistent with the foregoing has been entered this day.