DAINGERFIELD ISLAND PROTECTIVE
SOCIETY, INC., et al., Plaintiffs,

v.

Cecil D. ANDRUS et al., Defendants.

Civ. A. No. 78–0937.

United States District Court,
District of Columbia.

July 18, 1978.

David N. Prensky, Washington, D. C., for plaintiffs.

Dennis Dutterer, Asst. U. S. Atty., Washington, D. C., for defendants.

MEMORANDUM

GASCH, District Judge.

Plaintiffs request declaratory and injunctive relief against defendants for alleged violations of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.* Specifically, they seek to enjoin defendants from further consideration of an application for approval of a plan for construction of an access structure immediately opposite Daingerfield Island. Plaintiffs base their claim on the contention that the procedural requirements under NEPA have not been complied with "to the fullest extent possible." Presently before the Court are plaintiffs' motion for preliminary injunction and defendants' motion to dismiss, or in the alternative, for summary judgment.

Plaintiffs include five individuals who use and enjoy the facilities at Daingerfield Island and use Mount Vernon Memorial Highway (also known as the George Washington Memorial Parkway) and Daingerfield Island Protective Society (DIPS), a nonprofit organization whose members use Daingerfield Island. Daingerfield Island is an area (approximately 106.27 acres) of Mount Vernon Memorial Highway in Alexandria, Virginia, along the Potomac River adjacent to the southern boundary of Washington National Airport. Daingerfield Island contains a public sailing marina, recreational facilities, and a segment of a bike path. The purpose of DIPS is to promote the protection and preservation of the environmental quality of Daingerfield Island. Defendants include Cecil Andrus (Secretary of the Department of the Interior); Robert Herbst (Assistant Secretary for Fish, Wildlife, and Parks of the Department of the Interior); William J. Whalen (Director of the National Park Service); Manus J. Fish

(Director of the National Capital Region of the National Park Service), and Hugh B. Muller (Acting Superintendent of the George Washington National Parkway). On July 7, 1978, Richmond, Fredericksburg and Potomac Railroad Company, owner of the property that is the subject of this litigation, and Fairchild & Company, lessee of the same property, were granted leave to intervene as defendants.

## BACKGROUND

On or about February 27, 1967, it was proposed that the Department of the Interior (Department), Richmond, Fredericksburg and Potomac Railroad (RF&P) and Fairchild and Company (Fairchild) enter into an exchange agreement involving lands in the Alexandria, Virginia area. Pursuant to this exchange agreement, which was executed on June 5, 1970, the Department granted Fairchild and RF&P an easement on the Mount Vernon Memorial Highway at the entrance of Daingerfield Island in consideration for conveyance to the United States of approximately twenty-nine acres of Potomac River marshland located in Fairfax County, Virginia (known as Dyke Marsh tract) owned by Fairchild. This exchange agreement provided access from the Mount Vernon Highway to a 38.5 acre parcel of land (known as the Potomac Center tract) situated across the highway from Daingerfield Island. The Potomac Center tract is owned by RF&P and is leased by Fairchild.

The exchange agreement specifically provides that:

[t]he United States will deed, grant, and/or issue such easements or other interests in land of the United States as may be necessary to establish adequate perpetual access to, including ingress and egress from, the Parkway to The Potomac Center tract . . . .

¶ (1). In consideration for this easement, Fairchild and RF&P agreed "at no cost to the United States, to provide a center-piered bridge comparable in "H Loading" style and type to the southernmost bridge leading from the National Airport south to Alexandria." ¶ 3. Finally, the parties agreed that "all plans for construction of the bridge and related approaches, ramps, and connections are to be approved by the National Park Service, the National Capital Planning Commission, and the Fine Arts Commission." ¶ 11.

On May 13, 1970, prior to the execution of the exchange agreement, the Associate Director for Professional Services of the National Park Service prepared a memorandum, entitled "Environmental Factors, Dyke Marsh-Potomac Center Project," in an attempt to comply with the requirements of the newly-enacted National Environmental Policy Act. After addressing traffic and aesthetic considerations, the memorandum concluded:

there would be minimal adverse environmental import (sic) by reason of granting access to the George Washington Memorial Parkway, and there would be some environmental benefits by reason of Federal ownership of an additional portion of Dyke Marsh.

The proposed agreement is in the public interest and should be concluded.

Since 1973, Mr. Fairchild has submitted several plans for construction of the Potomac access structure. The National Park Service (NPS) has determined that all diagrams submitted by Mr. Fairchild were inadequate. In a letter dated July 7, 1978, the NPS informed Mr. Fairchild that his latest submission was unacceptable. The NPS has not yet approved a plan for construction of the bridge and does not presently have a proposal under consideration.

## MERITS

Section 102(2)(V) provides, in relevant part, that all federal agencies shall:

(c) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action
. . ..

42 U.S.C. § 4332. Plaintiffs apparently argue that the submission of a proposal by a private party, Fairchild, to the federal government constitutes "federal action" sufficient to invoke the requirement that an environmental impact statement (EIS) be prepared. In other words, according to plaintiffs, the Government, *prior* to accepting or rejecting a private proposal submitted to it, must have prepared an EIS.

■ Plaintiffs' position is untenable in light of *Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency Procedures (SCRAP II),* 422 U.S. 289, 320, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), and *Kleppe v. Sierra Club,* 427 U.S. 390, 404–06, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). These cases establish that the earliest point at which an EIS is required is the time at which the agency makes a recommendation or reports on a proposal. In *SCRAP II, supra,* an EIS was not required until the ICC issued a report refusing to hold unlawful rate increases proposed by railroads. The Supreme Court clearly rejected the argument that the phrase "such statement . . . shall accompany the proposal through the existing agency review processes," 42 U.S.C. § 4332, requires early preparation of an EIS.

In *Kleppe v. Sierra Club, supra,* the Supreme Court reaffirmed that an EIS need not be prepared until the agency had formulated a proposal or report. The Court also clarified the earliest point at which a court may intervene to enforce compliance with NEPA. While acknowledging that responsible federal officials are required to "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved," 42 U.S.C. § 4332, the Court restricted judicial review of an agency's NEPA responsibilities until the time at which an EIS is required:

> [Section 4332] contemplates a consideration of environmental factors by agencies during the evolution of a report or recommendation on a proposal. But the time at which a court enters the process is when the report or recommendation on the proposal is made, and someone protests either the absence or the adequacy of the final impact statement. This is the point at which an agency's action has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption.

427 U.S. at 406 n. 15, 96 S.Ct. at 2728.

■ Upon application of this precedent to the instant case, the Court concludes that it has no jurisdiction at this early stage. Since the NPS has not yet acted on a plan submitted by Mr. Fairchild, there is no federal action. Thus, this case is not yet ripe for review.

Dismissal of the case at this time should not be interpreted by defendants or defendant-intervenors as an indication that the Court has concluded that defendants have no responsibilities under NEPA. It appears to the Court that an EIS may well be justified if and when the NPS approves a plan for construction of the access structure. Moreover, dismissal does not mean that defendants have no responsibilities under NEPA at this time; it merely means that courts have no authority to enforce compliance with NEPA at this time. Indeed, the effectiveness of NEPA depends in large part upon the defendants' good faith in implementing their NEPA responsibilities. This Court believes it is appropriate, in light of the apparently widespread interest in this proposal, to implore the defendants in the strongest possible terms to undertake their NEPA responsibilities *and* to involve all interested parties in the decision-making process at the earliest possible time.

## CONCLUSION

Having concluded that this case is not ripe for review, the Court will grant defendants' motion to dismiss and deny plaintiffs' motion for preliminary injunction. Accordingly, this action is dismissed without prejudice to plaintiffs' future rights.