## DAINGERFIELD ISLAND PROTECTIVE SOCIETY, et al., Appellants,

v.

## Manuel LUJAN, Jr., Secretary, Department of Interior, et al. and Richmond, Fredericksburg & Potomac Railroad Company and Potomac Greens Associates Partnership, Intervenors.

### No. 89–5165.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1990.

Decided Nov. 30, 1990.

Ronald J. Wilson, for appellants.

Mark E. Nagel, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., were on the brief, for federal appellees.

Thomas J. Farrell, II, for appellees, Richmond, Fredericksburg and Potomac Railroad Co., et al.

Before WALD, Chief Judge, MIKVA and RUTH BADER GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

The origin of this case is a 1970 agreement ("Exchange Agreement") by which the National Park Service ("NPS," "the Service") completed its acquisition of Dyke Marsh, an environmentally sensitive wetland on the Potomac River between Alexandria and Mount Vernon, Virginia. In exchange for the wetland property it acquired, NPS granted developer Charles Fairchild & Co. an easement to build an interchange on the George Washington Memorial Parkway ("Parkway"). Fairchild hoped that this interchange would one day channel traffic to Potomac Greens, a mammoth office, hotel and residential complex he planned to build on land he leased from intervenor-appellee Richmond, Fredericksburg & Potomac Railroad Co. ("RF & P"). Twenty years later, Fairchild's hopes remain unrealized: no construction has begun on either the interchange or the Potomac Greens complex.

Daingerfield Island Protective Society and its coappellants (collectively, "the Society") commenced this action in 1986 to set aside the 1970 Exchange Agreement and to void the approval of the interchange design granted by NPS in 1981 and the National Capital Planning Commission ("NCPC") in 1983. In response to defendants' motion for summary judgment, the district court dismissed the complaint in its entirety. The court declared moot all claims to void approval of the interchange design; and it rejected the attack on the 1970 Exchange

Agreement on the ground of laches. *Daingerfield Island Protective Soc'y v. Hodel*, 710 F.Supp. 368, 377 (D.D.C.1989).

In December 1989, we summarily affirmed the district court's decision to the extent that it dismissed as moot the Society's claim alleging violations of the National Environmental Policy Act of 1969 ("NEPA"). We now vacate the district court's mootness disposition to the extent that it covers counts of the complaint other than the NEPA claim; we also reverse the ruling on laches, and remand the case for further proceedings.

## I.

In the years before the 1970 Exchange Agreement, Fairchild unsuccessfully pursued various development strategies on his Dyke Marsh property. He first planned in 1964 to construct highrise apartments, but failed to obtain the necessary rezoning. Admin.Rec. at Tab 17. The next year he sought permission to fill the marsh and to dredge canals for a "50–home Palm Beach type development." Admin.Rec. at Tab 97. Because the marsh is a vital habitat to wading and water birds and various other small animals, environmental groups joined area residents, who feared the effects of new development, to oppose Fairchild's plans. These groups pressed the government to acquire the entire Dyke Marsh area. By 1966, NPS owned most of the acreage. *Id.* Facing dimming prospects of development on his 28.8–acre Dyke Marsh tract, Fairchild turned his attention to the 38–acre property across the Parkway that he leased from RF & P.

The 1970 Exchange Agreement provided that Fairchild would be entitled to Parkway access as soon as he deeded his Dyke Marsh property to the government. After delaying for more than a year, Fairchild conveyed a deed to the property in June 1971 and signed the Exchange Agreement on July 6, 1971. *Id.* at Tab 22. By its terms, the Agreement became effective on that date. The Agreement provided that Fairchild's construction could not commence until NPS, NCPC, and the Fine Arts Commission approved the design of the Parkway interchange; a paragraph of the Agreement, however, specified essential features of the design, and thus controlled the agencies' discretion. *Id.*

Fairchild did not submit construction plans for the interchange until 1975. *Id.* at Tab 41. His relations with NPS grew acrimonious, as the Service opposed Fairchild's complicated "reverse-flow" design. In 1976, after increased population and traffic had made NPS's limited 1970 environmental review obsolete, NPS ordered a full-scale environmental assessment of the interchange. *Id.* at Tabs 43, 54. The draft assessment, prepared by the National Capital Region of NPS, recommended that access be denied. 710 F.Supp. at 371. NPS's counsel, however, cautioned that Fairchild's right to Parkway access had vested in 1971, so that NPS could not simply refuse to grant access. *Id.* The National Capital Region of NPS then recommended repurchasing Fairchild's access rights. NPS did not adopt this recommendation, probably because it doubted that funds would be available for the repurchase. *Id.*

In May 1978, the Society sought to enjoin the Department of Interior and NPS from approving any interchange design. In its prayer for relief, the Society did not demand that the Agreement be set aside, nor, except for a hint in Paragraph 22 of its 52 paragraph complaint, did it even allege that the 1970 Exchange Agreement was unlawful. Rather, the Society's attention trained on NPS's consideration of the interchange design. *See* Verified Complaint for Declaratory and Equitable Relief under the National Environmental Policy Act of 1969, *Daingerfield Island Protective Soc'y v. Andrus*, (D.D.C.1978) (No. 78–0937). Because NPS had not yet acted on any proposed design, the district court dismissed the Society's challenge, without prejudice, as premature. *Daingerfield Island Protective Soc'y v. Andrus*, 458 F.Supp. 961 (D.D.C.1978).

In April 1981, after Fairchild at last gave up on his "reverse-flow" plan, NPS approved the interchange design, reserving its right to make changes when Fairchild submitted more detailed plans. 710

F.Supp. at 371–72. NPS's October 1983 Environmental Assessment concluded that the design was satisfactory, noting that because of the terms of the 1970 Exchange Agreement, the Service could not recommend a "no build" alternative. *Id.* at 372. The Commission of Fine Arts approved the design in April 1983, as did NCPC in November 1983. NPS issued a deed for the easement in August 1984. Prior to these approvals, in early 1982, RF & P had responded to Fairchild's delays by terminating his lease. The deed therefore went to RF & P as successor to Fairchild. *Id.* at 372 & n. 7.

In 1986, RF & P entered a joint venture with developer Savage/Fogarty Companies, Inc.; in late summer, Savage/Fogarty announced the joint venture's plans to build a somewhat smaller Potomac Greens complex. Admin.Rec. at Tabs 169–70. The Society then commenced this action. The Society's complaint, filed in August 1986, alleged that when NPS approved the 1970 land exchange, the Service violated NEPA (Count I), the Land and Water Conservation Fund Act (Count II), the Mount Vernon Highway Act and the Capper–Cramton Act (Count III), the National Park Service Organic Act (Count IV), the National Capital Planning Act (Count V), the Administrative Procedure Act ("APA") (Count VI), and the National Historic Preservation Act (Count IX). The complaint also alleged that NPS's approval of the interchange design violated NEPA (Count I), the Mount Vernon Highway Act and the Capper–Cramton Act (Count III), the National Park Service Organic Act (Count IV), the National Capital Planning Act (Count V), the APA (Count VI), Executive Order 11988 and Floodplain Management Guidelines (Count

VIII), and the National Historic Preservation Act (Count IX). Plaintiffs further charged that NCPC's approval of the interchange design violated the National Capital Planning Act (Count VII).[1]

The federal defendants and supporting private intervenors,[2] raising threshold defenses, moved for dismissal or summary judgment. During the pendency of the motion, Congress acted. As part of its December 22, 1987 Continuing Appropriations Act ("CAA"), Congress directed NPS to prepare, within eighteen months, an Environmental Impact Statement ("EIS") concerning the effect that Potomac Greens would have on traffic and on "the visual, recreational and historical integrity of the Parkway."[3] The EIS was to evaluate "alternative acquisition strategies," including but not limited to the possibilities of acquiring RF & P's access rights, the portion of its 38–acre parcel lying within the Alexandria historical district, or the entire parcel. Congress further instructed NPS to investigate any other reasonable means by which the Parkway could be preserved. No construction permit for the interchange was to issue until the completed EIS had been reviewed by the "appropriate" congressional committees for 60 days. NPS was to be sole judge of "the legal and factual sufficiency of the [EIS] and its compliance with [NEPA]." Finally, Congress provided:

> The [EIS] shall be separate from, independent of, and in no way intended to affect or modify any pending litigation. Notwithstanding any other provision of law, no court shall have jurisdiction to consider questions respecting the factual

---

1. For the statutes on which plaintiffs rely, see 42 U.S.C. § 4321 *et seq.* (NEPA); 16 U.S.C. § 460*l*–22(b) (Land and Water Conservation Fund Act); 45 Stat. 721 (Mount Vernon Memorial Highway Act); 46 Stat. 482 (Capper–Cramton Act); 16 U.S.C. § 1 *et seq.* (National Park Service Organic Act); 40 U.S.C. § 71 (National Capital Planning Act); 5 U.S.C. § 551 *et seq.* (APA); 16 U.S.C. § 470 *et seq.* (National Historic Preservation Act). For the Floodplain Management Guidelines, see 45 Fed.Reg. 35916 (May

28, 1980), as revised at 47 Fed.Reg. 36718 (August 23, 1982).

2. RF & P and Potomac Greens Associates Partnership were intervenors (usually referred to collectively as "RF & P"). Potomac Greens Associates Partnership is a joint venture of RF & P Development, Inc. (itself wholly owned by RF & P Corp.) and S/F Potomac Greens, Inc. (presumably a creation of Savage/Fogarty).

3. Apparently, the EIS has not yet issued.

and legal sufficiency of the [EIS] under [NEPA].

Pub.L. No. 100–202, 101 Stat. 1329–224 (1987).

The Society moved to stay consideration of its NEPA claim until the EIS issued. The district court denied that motion and granted defendants' motion for summary judgment, holding that all challenges to the 1981 and 1983 approvals of the interchange design were mooted by the CAA, and that all challenges to the 1970 Exchange Agreement were barred by laches. We summarily affirmed dismissal of the NEPA claim (Count I), and heard argument on the rest of the Society's appeal.

## II.

■ "The burden of demonstrating mootness 'is a heavy one.'" *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). In this case, however, the federal appellees and RF & P endeavored to shoulder this burden only with respect to the Society's NEPA claim; they did not even argue that the Society's other challenges to the approval of the interchange design were moot. Indeed, federal appellees noted their agreement with the Society "that the other counts of the Complaint continue to be ripe for [district court] resolution." Federal Defendants' Opposition to Plaintiffs' Motion for Stay of Count I of the Complaint 4 n. *. Nevertheless, the district court ruled that the CAA had mooted all of the Society's challenges to the interchange design approval.

The court's ruling, if we comprehend it correctly, rests on two considerations. First, the court understood plaintiffs to have made an encompassing concession. When the Society moved to hold its NEPA claim in abeyance, the court said, it admitted that an EIS, if actually prepared,

> provides the relief [plaintiffs] seek from this Court. That being the case, plaintiffs' motion, in effect, urges upon the Court that there is no longer *any* justici-

able controversy for this Court to consider.

710 F.Supp. at 377 (emphasis added). The Society's motion, however, requested precisely and only that the court stay consideration of Count I, its NEPA claim. The Society maintained:

> The other counts of the complaint ... are unaffected by the legislation, and The Society seeks expedited action on those counts. The legislation specifically states that the EIS "shall be separate from, independent of, and in no way intended to affect or modify any pending litigation."

Plaintiff's Motion for Stay of Count I of the Complaint 2, ¶ 4. In sum, the Society did *not* concede the mootness of its non-NEPA challenges to the interchange design approval; rather, the Society insisted that those claims remain vital.

Second, the district court may have read the 1987 CAA provisions as a withdrawal of judicial jurisdiction over *any* challenge to the interchange design approval. *See* 710 F.Supp. at 376–77. But Congress commanded only that "no court shall have jurisdiction *to consider questions respecting the factual and legal sufficiency of the [EIS] under [NEPA]*"; it hardly follows that Congress intended to "deprive[ ] [the district court] of further jurisdiction" *simpliciter. Id.* Rather, "absent a clear statement to the contrary, legislation should not ... be interpreted to oust a federal court's equitable power, or its jurisdiction over a present case." *Avery v. Secretary of Health & Human Servs.,* 762 F.2d 158, 163 (1st Cir.1985). And in this case, as the Society observes, the CAA explicitly provides that the required EIS "shall be separate from, independent of, and in no way intended to affect or modify any pending litigation." Congress, we are obliged to conclude, did not intend to deprive the district court of "further jurisdiction" to hear the non-NEPA challenges to the interchange design approval.

The district court did not consider with particularity the impact of the CAA on each of the Society's various pleas for declaratory and injunctive relief under the

Mount Vernon Highway Act, the Capper–Cramton Act, the National Park Service Organic Act, the APA, Executive Order 11988 and Floodplain Management Guidelines, the National Historic Preservation Act, and the National Capital Planning Act. Neither did the federal appellees, who view the Society's claims as if from a great distance:

> [The Society's] claims under the various statutes and Executive Order at bottom were that the Park Service had approved the design of the interchange without engaging in the public hearing and interagency review processes that [the Society] claims are mandated by those authorities. Its claims were thus quite similar to its NEPA claim, which alleged that no environmental assessment or EIS had been prepared with proper public participation.

Brief for Federal Appellees at 28–29. Federal appellees thus read the statutes and executive order as if each said, simply, "there shall be adequate public hearings and review," and they read the CAA as if it said, "No court shall entertain challenges to the Potomac Greens project grounded on inadequate public hearings or review." Yet the statutes, executive order, and guidelines on which the Society relies prescribe procedures and standards that have not been shown to be wholly reducible to those of either NEPA or the CAA. The CAA, it currently appears, has not given the Society all of the relief it sought in its non-NEPA challenges to the interchange approval.[4]

Closer, claim-specific analysis would be required before we could say that appellees have met the "heavy" burden of demonstrating mootness. *County of Los An-*geles v. Davis*, 440 U.S. at 631, 99 S.Ct. at 1383. The vitality *vel non* of the non-NEPA claims was not briefed before the district court; therefore that court was not equipped to perform the requisite analysis. Accordingly, we vacate the district court's ruling that the Society's non-NEPA challenges to the interchange approval were mooted by the CAA, and we remand for further proceedings.[5]

### III.

We turn next to the district court's dismissal, for untimeliness, of the attack on the 1970 Exchange Agreement. Laches, an affirmative defense under Rule 8(c) of the Federal Rules of Civil Procedure, requires a showing of inexcusable delay and undue prejudice. *Both* must be shown; a finding of laches cannot rest simply on the length of delay. *See, e.g., Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C.Cir.1982). As the district court acknowledged, 710 F.Supp. at 373, laches is a disfavored defense in environmental suits. *See National Wildlife Fed'n v. Burford*, 835 F.2d 305, 318 (D.C.Cir.1987). "Nearly every circuit ... and numerous district courts have recognized the salutary principle that '[l]aches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage. A less grudging application of the doctrine might defeat Congress's environmental policy.'" *Park County Resource Council, Inc. v. United States Dep't of Agriculture*, 817 F.2d 609, 617 (10th Cir.1987) (quoting *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 854 (9th Cir.1982), and collecting cases from the

---

4. The Society sought a declaratory judgment that approval of the interchange violated the Mount Vernon Memorial Highway Act, the Capper–Cramton Act, the National Planning Act, the APA, Executive Order 11988 and guidelines implementing the Order, and the National Historic Preservation Act and guidelines. It further asked the court to order NPS to resubmit the interchange design to the National Capital Planning Commission, and to comply with Executive Order 11988 and guidelines.

5. Appellees argue that the Society has abandoned Count III, waived relief on Count IV, and abandoned Counts V–VII and IX by failing to argue the merits in this court. They urge further that on Count VIII the Society should lose on the merits. The merits, however, were not ruled upon by the district court, and therefore will not be addressed by this court of review. The Society's brief, we note, makes clear that it continues to pursue each of its non-NEPA claims. *See* Brief by Appellants at 31–32 & n. 35.

First, Second, Fourth, Fifth, Sixth, Eighth, and Ninth Circuits).

■ Because laches is an equitable doctrine, courts have generally held that it "is primarily addressed to the discretion of the trial court." *National Wildlife Fed'n*, 835 F.2d at 318. However, the district court's discretion is "confined by established standards." *Park County Resource Council*, 817 F.2d at 617; *see also Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 867 n. 8 (5th Cir.1975). A district court's ruling on laches does not qualify for deference if the court applied the wrong legal standard. *See Park County Resource Council*, 817 F.2d at 617. Several appellate decisions, reversing district court judgments, are illustrative. *See, e.g., id.; Preservation Coalition*, 667 F.2d at 851; *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774 (9th Cir.1980) (Kennedy, J.); *Cady v. Morton*, 527 F.2d 786 (9th Cir.1975); *Ecology Center of Louisiana*, 515 F.2d at 860.

■ We have no cause to disturb the district court's finding that the Society's delay in bringing suit was inexcusable.[6] We reverse the court's laches ruling, nevertheless, on the ground that federal appellees and RF & P failed to demonstrate sufficient prejudice from the delay.

The district court expressly refused to rest its prejudice ruling solely on the amount of money that federal appellees, RF & P, and Potomac Greens spent in reliance on the 1970 Exchange Agreement.[7] On this point, we are in accord with the district court. The documented expenditures of the three appellees, so far as we can tell, add up to less than $692,000.[8] This figure is quite modest, compared to other cases in which no dispositive prejudice was found. *See, e.g., Environmental Defense Fund v. Tennessee Valley Auth.*, 468 F.2d 1164 (6th Cir.1972) ($29 million expended in reliance); *Park County Resource Council*, 817 F.2d at 609 ($1 million); *Coalition for Canyon Preservation*, 632 F.2d at 774 ($1 million); *Ecology Center of Louisiana*, 515 F.2d at 860 ($1 million).

Moreover, in environmental suits, the amount of money spent in reliance has not been considered the prime factor in the prejudice inquiry. Two factors have been accorded heavier weight. The first is the percentage of estimated total expenditures disbursed at the time of suit. *See, e.g.,*

---

**6.** The Society argues that its delay in opposing the exchange agreement should be measured from 1984, when NPS conveyed the easement deed to RF & P, or 1986, when RF & P formed its joint venture with Savage/Fogarty to develop the property. Appellants, particularly appellant Northeast Citizens Association, further argue that their vigor in opposing the Potomac Greens development as early as 1971 demonstrates that they did not sleep on their rights. We find decisive, however, the fact that the Society filed suit in 1978 to challenge the tentative interchange plans without (contrary to its current claim) challenging the Exchange Agreement. If, as the Society claims, the talk during 1976–84 of repurchasing Fairchild's access rights led it to believe that no challenge to the Exchange Agreement was necessary, why did it file suit in 1978 to challenge the interchange design plans, which presupposed the Agreement's validity?

**7.** RF & P estimates, without indicating a source, that Fairchild spent about $1.6 million in attempting to develop the property. Much of that expenditure, however, is the result of Fairchild's insistence on a "reverse-flow" interchange until 1981, although the Exchange Agreement specified a different design. *See Fairchild v. United*

*States,* No. 84–1452 (4th Cir. Aug. 22, 1985) (per curiam), *reprinted in* Joint Appendix at 377, 383. Thus we have no figure as to the amount Fairchild reasonably spent in reliance on the Agreement. Moreover, neither Fairchild, now deceased, nor his company were ever party to this suit. We therefore do not include their expenditures in the total.

**8.** As the district court noted, federal appellees never documented their expenditures, 710 F.Supp. at 375 n. 14. RF & P's estimated expenditures are difficult to determine. Its claim for $100,000 in salary expenses covers the years 1965 to November 1986, rather than the proper period of July 6, 1971 (the effective date of the Exchange Agreement) to August 27, 1986 (the day suit was filed). It claims additional expenditures of about $135,000, some of which, however, were for items that have independent value. *See* Affidavit of Urchie B. Ellis, Exh. A to Intervenors' Memorandum in Support of Motion to Dismiss or for Summary Judgment, at 7. Finally, Potomac Greens estimated its expenditures at about $457,000 as of the time the Society filed suit. *See* Attachment 2a to Intervenors' Memorandum in Support of Motion to Dismiss or for Summary Judgment.

*Park County Resource Council,* 817 F.2d at 618. Here, the estimated total expenditures are about $500 million, hence the amount disbursed so far is relatively insignificant. Second, courts have examined whether the relief plaintiffs seek is still practicable. This consideration—the crucial one in the prior cases—has turned on the degree to which construction is complete. *See Preservation Coalition,* 667 F.2d at 855 ("Delay may be prejudicial if substantial work has been completed before the suit was brought, but even substantial completion is sometimes insufficient to bar suit.") (emphasis deleted). *Compare, e.g., Coalition for Canyon Preservation,* 632 F.2d at 774 (no significant prejudice where right of way cleared, but road not built) *and Watershed Assocs. Rescue v. Alexander,* 586 F.Supp. 978 (D.Neb.1982) (no significant prejudice; right of way cleared, but construction of levee not begun), *with Citizens & Landowners Against the Miles City/New Underwood Powerline v. Secretary, United States Dep't of Energy,* 683 F.2d 1171 (8th Cir.1982) (prejudice found, since challenged power line nearly complete) *and National Parks & Conservation Ass'n v. Hodel,* 679 F.Supp. 49 (D.D.C.1987) (prejudice found, since challenged restaurant on Daingerfield Island completed before suit filed). Here, not only has construction not begun, but a construction permit has not issued and cannot issue until Congress passes, if only silently, on the EIS that NPS is still preparing.

The district court expressly determined that appellees' expenditures and the extremely limited development so far carried out would not, taken together, "rise to the requisite level of prejudice that would justify application of the laches doctrine." 710 F.Supp. at 375. Rather, the court rested its finding of prejudice on the environmental consequences of undoing the Exchange Agreement. The Dyke Marsh tract exchanged by Fairchild, the court observed, would revert to private hands, and this "would terminate a right the public has enjoyed for almost a decade: the right to continued enjoyment of the wetlands in their pristine state." *Id.* The district court stated that

> plaintiffs completely ignore the other half of the Exchange Agreement: the United States' acquisition of ownership of Dyke Marsh. Even though there has been no preparatory construction on the site of the traffic interchange, we cannot overlook or turn our back to the environmental importance of the wetlands having been placed under government ownership since 1971. It is singularly ironic that plaintiffs dedicated to the preservation of environmental values should pay no attention to these factors.

*Id.* In combination with the time and resources appellees spent in reliance on the Exchange Agreement, the court reasoned, the harm to the public and the environment would constitute sufficient prejudice to invoke the laches doctrine. *Id.*

The Society argues that the marsh was undevelopable even in 1970, so that no harm to the environment in fact would have occurred if the Exchange Agreement had never been concluded. We are not entirely persuaded by this argument. Federal appellees and intervenors have suggested, although not demonstrated, that it was post-Agreement legislation protecting wetlands that made the marsh undevelopable.[9] And in any case, if the Dyke Marsh

---

9. Both further state without documentation that this legislation has cost RF & P the opportunity to develop the Dyke Marsh tract that it would have had if the Exchange Agreement had been promptly invalidated. We do not find it obvious that, as RF & P asserts without explanation, the Dyke Marsh land will be "returned" to it if the Agreement is invalidated. We gather that RF & P relies upon the provision in the lease with Fairchild that gives the railroad "any and all right, title, and interest that [Fairchild], or its successors and assigns, may have or retain pursuant to the Exchange Agreement" if the lease is terminated. Admin.Rec., Tab 26 at 57. RF & P, then, could not even arguably invoke Fairchild's right to return of the land unless the Exchange Agreement were invalidated after January 31, 1982, when Fairchild defaulted and RF & P assumed his rights under the lease. *See* Admin. Rec. at Tab 118. Neither here nor in the district court, however, did RF & P indicate that the legislation preventing development became effective after that date. We therefore cannot accept the vaguely-stated contention that post-Exchange Agreement legislation has deprived

tract reverted to private hands, the public would stand to lose its right to use the land, even if no development took place.

We reverse the district court's laches ruling for a different reason. The court remarked that the Society had considered only one side of the environmental harm issue. The district court itself, however, similarly limited its consideration. The court was sensitive to the harm that might occur if the Dyke Marsh tract were to revert to private ownership, but it did not consider the environmental *benefit* that might result if the Exchange Agreement were voided and the Potomac Greens development blocked.

In principle, the court could have evaluated the public or environmental harms and benefits even-handedly if it had considered not just the harm of losing a portion of Dyke Marsh, but also the benefits that successful suit would bring. As a practical matter, however, the court could not have reliably estimated the environmental benefit of voiding the Exchange Agreement and stopping the Potomac Greens development without, in effect, writing its own EIS. We do not impose on the district court the task of rebalancing the environmental harms and benefits on remand. Laches is a doctrine that prevents courts from reaching the merits of a case; here, however, a fair application of the district court's balancing method would have required that court to do more than rule on the merits of plaintiffs' allegations—it would have required the district judge to undertake the very action plaintiffs originally sought from NPS.

We thus return to the consideration precedent marks as crucial. In both of the briefs that the Society filed in this court, it contended that in every environmental case where a court grounded summary judgment on the defense of laches, the harm-generating activity plaintiffs sought to pre-vent had already begun to occur, typically because construction of the project plaintiffs sought to block was underway. Since appellees had cited no contrary decision, nor had we discovered one in our own research, we asked federal appellees at oral argument whether one existed. They were unable to identify such a case.[10] Here, no construction has begun on the interchange or on the Potomac Greens complex; the damage that plaintiffs sought to prevent thus has not begun to occur. The defense of laches, we hold, must be rejected under the circumstances this case presents.

### CONCLUSION

We vacate the district court's mootness dismissal of the Society's challenges to the 1981 and 1983 interchange design approvals, reverse its ruling that the Society's challenges to the 1970 Exchange Agreement were barred by laches, and remand for further proceedings consistent with this opinion.

*It is so ordered.*

---

RF & P of any opportunity it would have had to develop the Dyke Marsh tract. Moreover, since any claim that RF & P might have to the Dyke Marsh land presupposes an almost eleven-year delay in invalidating the Exchange Agreement, RF & P can hardly complain that it has been prejudiced in this respect by the Society's tardiness in challenging that Agreement.

10. Counsel for the federal appellees cited Clark v. Volpe, 461 F.2d 1266 (5th Cir.1972). The first sentence of that opinion, however, states: "[P]laintiffs seek to enjoin the *construction, already in progress when suit was filed,* of Interstate Highway 610 through City Park in the City of New Orleans." *Id.* at 1266 (emphasis added).