**DAINGERFIELD ISLAND
PROTECTIVE SOCIETY,
et al., Appellants,**

v.

**Bruce BABBITT, Secretary, U.S.
Department of Interior, et
al., Appellees.**

No. 93–5218.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 7, 1994.

Decided Nov. 22, 1994.

As Amended Nov. 22, 1994.

Rehearing and Suggestion for Rehearing
In Banc Denied Feb. 8, 1995.

Ronald J. Wilson, Washington, DC, argued the cause, for appellants.

Mark E. Nagle, Asst. U.S. Atty., Washington, DC, argued the cause for appellees. On brief for the government appellees were Eric H. Holder, Jr., U.S. Atty., and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, DC.

On brief for appellees Richmond, Fredericksburg and Potomac R. Co. and Potomac Greens Associates Partnership was Thomas F. Farrell II, Alexandria, VA.

Before WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

Opinion dissenting in part filed by Circuit Judge WALD.

KAREN LeCRAFT HENDERSON, Circuit Judge:

This case is before us for a second time, after remand to the district court. The facts and procedural history are set out in detail in the district court decisions[1] and we provide here only a brief summary.

In 1970 the Secretary of the Interior signed a land exchange agreement (Exchange Agreement) under which the National Park Service (Park Service) was to convey an easement for an interchange over the George Washington Parkway (Parkway) to Charles Fairchild & Co. (Fairchild) in exchange for title to Dyke Marsh, a 28.8 acre wetlands tract along the Potomac River. The purpose of the easement was "to establish adequate perpetual access to, including ingress and egress from, the Parkway to the Potomac Center tract," a parcel south of the Parkway that Fairchild was then leasing from appellant Richmond, Fredericksburg & Potomac Railroad Co. (RF & P) with the intent to develop a commercial/residential complex called "Potomac Greens." Joint Appendix (JA) 43. The agreement required, inter alia, that before construction of the Parkway in-

1. *See Daingerfield Island Protective Society v. Babbitt,* 823 F.Supp. 950 (D.D.C.1993); *Daingerfield Island Protective Society v. Lujan,* 797 F.Supp. 25 (D.D.C.1992); *Daingerfield Island Protective Society v. Hodel,* 710 F.Supp. 368 (D.D.C.1989).

terchange its design be approved by the Park Service, the National Capital Planning Commission and the Fine Arts Commission. Fairchild signed the agreement and deeded Dyke Marsh to the Park Service in July 1971 but, when its attempts to obtain the required design approval proved unsuccessful, Fairchild terminated its lease with RF & P. In 1983, the Park Service finally approved an interchange design submitted by RF & P and deeded an easement to the railroad as Fairchild's successor under the Exchange Agreement.

In 1986, after RF & P made public its plans for developing Potomac Greens, Daingerfield filed this action alleging that both the Exchange Agreement and the interchange design approval violated various federal laws. Initially, the district court granted summary judgment to the Park Service on the grounds that the challenge to the Exchange Agreement was barred by laches and the challenge to the design approval had been mooted by congressional action requiring the Park Service to conduct an environmental impact study, which it had done. *Daingerfield Island Protective Society v. Hodel,* 710 F.Supp. 368 (D.D.C.1989). Daingerfield appealed and this court summarily affirmed the mootness ruling as it applied to Daingerfield's National Environmental Policy Act claim. The court then reversed the judgment in all other respects and remanded for further consideration of the remaining claims. *Daingerfield Island Protective Society v. Lujan,* 920 F.2d 32 (D.C.Cir.1990), *cert. denied,* — U.S. —, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991). On remand, the district court again granted summary judgment to the Park Service, holding that (1) the challenge to the Exchange Agreement was barred by the six-year statute of limitations set out in the Tucker Act, 28 U.S.C. § 2401, *see Daingerfield Island Protective Society v. Lujan,* 797 F.Supp. 25 (D.D.C.1992), and (2) the interchange design approval did not violate any of the federal laws at issue, *see Daingerfield Island Protective Society v. Babbitt,* 823 F.Supp. 950 (D.D.C.1993).

Daingerfield again appealed the district court's judgment. In an unpublished order this court summarily affirmed the judgment as it applied to claims alleged under the Mount Vernon Memorial Highway Act, the Capper–Cramton Act and the rulemaking provisions of the Administrative Procedure Act. The court further held that the Tucker Act's six-year statute of limitations governed the appellants' challenge to the Exchange Agreement and that that cause of action had accrued more than six years before the action was filed. *Daingerfield Island Protective Society v. Babbitt,* No.93–5218, 15 F.3d 1159 (Table), 1993 WL 557107 (D.C.Cir. Dec. 13, 1993). We now address the remaining issues on appeal and hold that (1) the government did not waive its statute of limitations defense and the Exchange Agreement challenge is accordingly barred by the Tucker Act and (2) the design approval does not contravene any of the cited laws.

## I.

First, we consider whether Daingerfield's challenge to the Exchange Agreement is barred by the Tucker Act's six-year statute of limitations. Daingerfield asserts that the government waived the limitations defense by (1) failing to plead it with sufficient specificity and (2) waiting until after remand to assert it by motion. The government responds that the defense cannot be waived because it is jurisdictional and, in any event, was not waived here. Because we conclude the limitations defense was not waived, we affirm the district court's limitations ruling without deciding whether the defense might under other circumstances be waivable.

First, we conclude that the government adequately pleaded the limitation defense in its answer, which reads in part: "Plaintiffs' claims are barred by the applicable statute of limitations." JA 38. While this boilerplate language does not cite the specific statute applicable here, it nevertheless satisfies the requirement of Federal Rule of Civil Procedure 8(c) that affirmative defenses be pleaded. The purpose of that rule is to put opposing parties on notice of affirmative defenses and to afford them the opportunity to respond to the defenses. *Blonder–Tongue Labs., Inc. v. University of Illinois Found.,* 402 U.S. 313, 350, 91 S.Ct. 1434, 1453–54, 28 L.Ed.2d 788 (1971). Thus,

while a limitations defense must "be asserted in a responsive pleading," it " 'need not be articulated with any rigorous degree of specificity,' " and is " 'sufficiently raised for purposes of Rule 8 by its *bare assertion*.' " *Kulzer v. Pittsburgh-Corning Corp.*, 942 F.2d 122, 125 (2d Cir.1991) (quoting *Santos v. District Council of New York City*, 619 F.2d 963, 967 (2d Cir.1980)) (emphasis in original), *cert. denied*, — U.S. —, 112 S.Ct. 1482, 117 L.Ed.2d 624 (1992). This is particularly true here where, as we observed in our summary disposition order, "it is clear that the six-year statute of limitations contained in 28 U.S.C. § 2401 governs [Daingerfield's claims]."

■ Nor do we believe the government abandoned its limitations defense by failing to assert it before the first appeal. Under the usual rule, an affirmative defense is deemed waived if it "has not been raised in a pleading, by motion, or at trial." *National Treasury Employees Union v. IRS*, 765 F.2d 1174, 1176 n. 1 (D.C.Cir.1985) (quoting C. Wright & A. Miller, *Federal Practice and Procedure* § 1394, at 872 (1969)). As we have already noted, the government adequately raised the limitations defense in its answer—it was not required to reassert the defense in its subsequent successful summary judgment motion. In urging abandonment, Daingerfield relies on our recent decision in *United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469 (D.C.Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 3039, 125 L.Ed.2d 726 (1993), in which this court affirmed the district court's holding that one of the defendants "abandoned its affirmative defenses," including a limitations defense, "by not raising them prior to summary judgment." *Id.* at 478. We find that holding inapposite. The defendant in *Pittston* apparently waived its defenses from the beginning, having never asserted them in any pleading or motion in the district court.[2] Thus, the *Pittston* court simply found that waiver precluded the defendant from raising those defenses for the first time after summary judgment had been granted in the plaintiff's favor. Our holding here is consistent with that finding.

For the foregoing reasons, we conclude the government did not waive its statute of limitations defense and that Daingerfield is therefore barred by the six-year limitations period from challenging the government's decision to enter into the Exchange Agreement. Accordingly, we need address here only Daingerfield's challenge to the interchange design approved by the Park Service.

## II.

Daingerfield contends that the approval of the interchange design violated (1) the National Park Service Organic Act, (2) the National Historic Preservation Act, (3) the National Capital Planning Act and (4) Executive Order No. 11988 and guidelines adopted pursuant thereto. We disagree and conclude the Park Service, and the other agencies involved, adequately complied with the cited laws.

■ First, Daingerfield argues that the interchange design approval violated the National Park Service Organic Act which requires, in general terms, that the Park Service

> shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified, except such as are under the jurisdiction of the Secretary of the Army, as provided by law, by such means and

2. The waiving defendant in *Pittston* was initially sued in the Southern District of West Virginia where "the running of the limitations period was plainly not an issue under West Virginia law." 984 F.2d at 478. Thus, it could not have been raised in the defendant's pleadings or motions in that district. Further, once the suit was transferred to this district, the defendant waited until after summary judgment was granted against it to assert the defense here. *See id.* (noting that the defendant did not brief the defense at summary judgment but "merely asserted that it had certain defenses, one of which was based on the statute of limitations, that were not applicable to the other defendants"). While it is not clear from the decisions of this court or the district court whether the *Pittston* defendant ever pleaded its other defense of laches, this court's opinion suggests it did not. *See id.* ("[W]e affirm the District Court's holding that [the defendant] abandoned its affirmative defenses by not *raising* them prior to summary judgment.") (emphasis added).

measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1. As the district court correctly observed, this language gives the Park Service "broad, but not unlimited discretion in determining what actions are best calculated to protect Park resources." 823 F.Supp. at 956. We must uphold the Park Service's exercise of discretion unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and so long as it is "based on a reasoned, permissible construction of the relevant statute." *Canyoneers, Inc. v. Hodel,* 756 F.2d 754, 757 (9th Cir.) (citing the Administrative Procedure Act, 5 U.S.C. § 706(2)(A); *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)), *cert. denied,* 474 U.S. 846, 106 S.Ct. 138, 88 L.Ed.2d 114 (1985). The Park Service's actions here do not warrant reversal under those standards.

The record demonstrates that the Park Service considered various interchange designs over a seven-year period, reviewing their possible effects on, inter alia, traffic, the wetlands and Daingerfield Island itself. Based on all its studies, the Park Service ultimately approved a modified, diamond-shaped interchange that it concluded would have the least deleterious effect on the environment. Under these circumstances we cannot say the Park Service's approval was an abuse of its broad statutory discretion. In fact, Daingerfield does not challenge the particular design the Park Service approved but asserts instead that the construction of *any* interchange will violate the statutory mandate to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same." Thus, Daingerfield's complaint here is not with the design approved in 1984 but with the Park Service's original binding commitment in 1970 to grant an easement for access to Potomac Greens.[3] We have already found this challenge foreclosed by the Tucker Act's statute of limitations.

Second, Daingerfield contends the design approval violated the National Historic Preservation Act which requires that "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or Federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking" (1) "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" and (2) "afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470f. Daingerfield does not dispute that the Park Service consulted and obtained design approval from the Advisory Council on Historic Preservation but argues the Park Service failed to submit adequate information to the Council. Specifically, Daingerfield argues the Park Service's submissions identified only one historic site affected by the project, the Parkway itself, ignoring the effect on other historic sites in the city of Alexandria, Virginia. Again Daingerfield's objection is primarily to the visual effects of any interchange, rather than to the particular design approved, which Daingerfield does not dispute is designed to minimize adverse effects. In any event, the Advisory Council was aware of the location of the proposed interchange and its proximity to other historic sites in Alexandria. Had the Council deemed the impact on those sites significant, it could have requested additional information or sua sponte considered the potential effects on them. Instead, the Council, whose

3. As the district court observed:

[The Park Service] was firmly advised by counsel that the Exchange Agreement was legally binding. Thus the only choice left to [the Park Service] was to approve the least intrusive interchange possible, which it did, or to refuse to approve any interchange at all, which would have violated the Exchange Agreement that it had been informed was legally binding on the federal government.

823 F.Supp. at 956 (record citation omitted).

statutory role is in any event only advisory, acted on the information it considered necessary and found the proposed design appropriate. Thus, we find no violation of the National Historic Preservation Act.

Third, Daingerfield contends the design approval violated the National Capital Planning Act. That act establishes the National Capital Planning Commission and requires that

> each Federal and District of Columbia agency prior to the preparation of construction plans originated by such agency for proposed developments and projects or to commitments for the acquisition of land, to be paid for in whole or in part from Federal or District funds, shall advise and consult with the Commission in the preparation by the agency of plans and programs in preliminary and successive stages which affect the plan and development of the National Capital.

40 U.S.C. § 71d(a). The Commission must then provide the agency with its "preliminary report and recommendations." If the agency disagrees with the report, "it shall advise the Commission with its reasons therefor, and the Commission shall submit a final report." *Id.* In the end, "[a]fter such consultation and suitable consideration of the views of the Commission the agency may proceed to take action in accordance with its legal responsibilities and authority." *Id.* It is undisputed that the Commission in fact reviewed and approved the proposed interchange design, thereby fulfilling its statutory advisory duty. Nevertheless, Daingerfield faults the review process because the Commission ultimately approved the design after preliminarily finding any interchange inconsistent with the Commission's comprehensive regional plan [4] and recommending that it therefore not be built at all. Those earlier negative findings and recommendations, however, demonstrate that the Commission in fact fulfilled its statutory advisory duties by objectively examining the interchange design and candidly expressing its view to the Park Service. The Commission's ultimate approval of the design, as modified in accordance with its recommendations, simply reflects the Commission's recognition of the Park Service's legal duty under the Exchange Agreement to grant an easement to RF & P.

Finally, Daingerfield alleges the design approval violated Executive Order 11988, and guidelines adopted thereunder, which required it to identify the proposed interchange as a project "in or affecting a floodplain," to consider both its effect on the floodplain and possible alternatives to it and to take steps to minimize any flood hazard posed by the project. We conclude that the Park Service fulfilled its obligations here as well.

Daingerfield's primary objection is to the Park Service's alleged failure to consider a single alternative, namely, no interchange at all. As the record makes manifest, however, the Park Service gave that alternative serious consideration and in fact decided preliminarily to adopt it. In the end, however, that option was rejected on counsel's advice that the Park Service was legally required to provide some access from the Parkway to Potomac Greens. Further, the Park Service expressly acknowledged that the interchange will be constructed in a "100 year floodplain" and affirmatively required design changes to ameliorate adverse effects on the floodplain.[5] Accordingly, we conclude the Park Service has met the requirements of the executive order and of the guidelines.

For the preceding reasons, the district court's summary judgment is

*Affirmed.*

4. One of the Commission's "principal duties" under the Planning Act is to "prepare, adopt, and amend a comprehensive plan for the Federal activities in the National Capital and make related recommendations to the appropriate developmental agencies." 40 U.S.C. § 71a(e).

5. *See* JA 347–48 (setting ramp grades at level that would "minimize the length of each ramp and, thus, reduce the area and amount of fill" and requiring that "all ramps to the proposed overpass would be structured spans rather than roadways on fill," a "structural design alternative [that] allows free flow of flood waters"). In addition, RF & P and the government have agreed to work out any additional floodplain-related problems that may arise during construction. RF & P Supplemental Appendix tab 143.

WALD, Circuit Judge, dissenting in part:

It is indeed a difficult question whether the Tucker Act's statute of limitations is jurisdictional and therefore not waivable. The logic of our past cases does suggest that such a statute of limitations acts as a "condition on the waiver of sovereign immunity," *United States v. Mottaz,* 476 U.S. 834, 841, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986), setting an outer time limit on the subject matter jurisdiction of federal courts for claims against the government, which cannot be waived, *Walters v. Secretary of Defense,* 725 F.2d 107, 112 n. 12 (D.C.Cir.1983). Nevertheless, since the majority does not reach this novel question, and since the implications of deciding it in the government's favor are weighty and deserving of full study and dialogue, I too am content to leave its resolution to another day.

Assuming *arguendo* that the time bar is waivable, I disagree with the majority, however, in its principal conclusion that the government did not waive it here. The government's failure to cite in its answer any specific statute of limitations might be forgiven under the liberal notice pleading requirements of the Federal Rules of Civil Procedure.[1] But its subsequent failure to raise the limitations defense in any way, shape or form up through the grant of summary judgment and the appeal of that judgment is not so easily dismissed. In sum, its overall strategy of totally ignoring any further reference to the statute of limitations until after remand from a court of appeals rejection of its primary laches defense five years later, did amount to a waiver of the limitations bar. That strategy, moreover, indicates too cavalier an approach toward the judicial process and the resources of the court to pass muster.

The tortured procedural history of this case bears out my view. The Society first filed suit in federal district court in 1978, challenging the Park Service's failure to prepare an environmental impact statement for a proposed interchange on the George Washington Memorial Parkway, to be built as part of a private development pursuant to its 1970 land exchange agreement with a private party. The government successfully argued that the case was not ripe for adjudication, because at that point the interchange construction was merely "a proposal by a private party" which the government had not yet accepted or rejected. *Daingerfield Island Protective Soc. v. Andrus,* 458 F.Supp. 961, 963 (D.D.C.1978). After the Park Service finally issued a deed of easement in 1984 implementing the land exchange agreement, and various government agencies had approved an interchange design, the private developer announced in 1986 that it would proceed with the development. The Society promptly brought suit in district court, reasonably believing on the basis of the district court's previous decision that the proper time to challenge the government's action had arrived. The government, however, responded somewhat surprisingly that it was now too *late* to bring such a suit, asserting an affirmative defense of laches and—as if by way of afterthought—throwing in a boilerplate reference to "the applicable statute of limitations" (whichever one that might be) in its answer. The government pressed the theory of laches, but remained utterly mute on the subject of the statute of limitations for the next five years. In the meantime, the government moved for dismissal or in the alternative for summary judgment on its principal defense of laches—an equitable defense normally and logically argued in tandem with its legal cousin, the statute of limitations, when the latter is available. After the government prevailed on its laches defense in the trial court, *Daingerfield Island Protective Soc. v. Hodel,* 710 F.Supp. 368 (D.D.C.1989), the Society appealed. We reversed and sent the case back to the district court for further proceedings on the merits. *Daingerfield Island Protective Soc. v. Lujan,* 920 F.2d 32 (D.C.Cir.1990). Only then, having lost an appeal of its laches defense and faced with the prospect of having to defend on the merits, did the government assert its statute of limitations defense in substance. I do not believe that mere boilerplate recitation of the

1. *Cf. Wyshak v. City Nat. Bank,* 607 F.2d 824 (9th Cir.1979) (bare reference to "applicable statute of limitations" in answer is sufficient when supported by memorandum outlining argument and citing specific statute).

words "applicable statute of limitations" in a responsive pleading serves to license the government or any other litigant to preserve the defense indefinitely in some "legal 'limbo'" as an "'unargued' affirmative defense[ ]," *Pantry Inc. v. Stop-N-Go Foods, Inc.,* 796 F.Supp. 1164, 1168 (D.D.C.1992), available to be dredged up at any point in the proceedings after other defenses fail. Under the circumstances recounted here, I would rule that the government has abandoned and waived its statute of limitations defense. *Cf. United Mine Workers 1974 Pension Fund v. Pittston Co.,* 984 F.2d 469, 478 (D.C.Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 3040, 125 L.Ed.2d 726 (1993) (defendant's "failure to brief the limitations defense" in opposition to motion for summary judgment constitutes abandonment of defense);[2] *Burton v. Northern Dutchess Hospital,* 106 F.R.D. 477 (S.D.N.Y.1985) (failure to argue potentially dispositive issue of deficient service of process over three and one-half years waives defense, even though defense was asserted in answer).

The Federal Rules of Civil Procedure are designed to promote the twin goals of judicial economy and fairness to litigants, in part by requiring early consolidation of claims and defenses to eliminate dilatory motion practice and to promote speedy resolution of cases. Rule 8(c) requires presentation of all affirmative defenses in a single responsive pleading, and Rule 12(g) requires consolidation of all pre-pleading defenses in a single dispositive motion. Defenses not so consolidated are generally waived. Rule 12(h)(2), however, allows exceptions to the Rule 12(g) requirement for certain kinds of motions, including motions to dismiss for failure to state a claim, which "may be made in any pleading ... or by motion for judgment on the pleadings, or at the trial on the merits." Although nothing in the Federal Rules specifically forbids the filing of later dispositive motions falling within the Rule 12(h)(2) exceptions, "the spirit of Rule 12(g) is violated when a [Rule 12 dispositive] motion ... is filed after a summary judgment motion was made." 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1387 (1990). Allowing the government to resurrect its statute of limitations defense at so late a stage—after an unsuccessful laches defense has been taken to the court of appeals and rejected—undercuts the thrust and purpose of the Federal Rules by encouraging piecemeal litigation punctuated by *seriatim* appeals, burdening parties and the courts with unnecessarily protracted litigation, and depriving them of fair notice and timely resolution of dispositive issues. There is no reason to countenance or encourage that kind of "Gotcha!" tactic by the government.

### The Park Service's Statutory Obligations

I also disagree with the majority's conclusion that, because the Park Service had entered a "legally binding" agreement to build a highway interchange, it was thereby relieved of all further statutory duties to review the environmental, historic, scenic, and recreational consequences of the construction project, except as to narrow design questions. In my view, the agency remained under a statutory obligation to evaluate the entire construction project in light of statutorily-mandated considerations, and to weigh *all* its options, including the possibility of

2. The majority characterizes *Pittston* as a case in which the "defendant ... apparently waived its defenses from the beginning, having never asserted them in any pleading or motion in the district court," *supra* at 445. But the majority's attempt to distinguish *Pittston* is too facile. Whether or not the defendant in *Pittston* ever properly raised the statute of limitations, *see* Majority opinion at 445 n. 2, we held more generally in *Pittston* that the defendant had abandoned *all* its affirmative defenses, including those it apparently *had* initially asserted in its pleadings, stating that "failure to raise an affirmative defense in opposition to a motion for summary judgment constitutes an *abandonment* of the defense" on the grounds that "[s]ince disposition on summary judgment would resolve the case as a matter of law, [defendant] naturally should have *briefed* dispositive legal defenses like the running of the limitations period." 984 F.2d at 478 (emphasis added). *See also UMWA 1974 Pension Trust v. Pittston Co.,* 793 F.Supp. 339, 344 (D.D.C.1992) (defendant "waived [its] ... affirmative defenses by not asserting them in its own motion for summary judgment and, more importantly, by not asserting them in its opposition to [plaintiff's] motion for summary judgment").

defaulting on, or buying out, its construction obligations under the land exchange agreement. Of course, a default or buyout may ultimately prove impractical or unsound, and we would not lightly disturb such an agency determination; but in this case, the agency did not even make the inquiry, much less give a reasoned explanation for its decision to proceed with the construction project. The majority's approach would allow an agency to limit the scope of its statutory obligations by "contracting out" of them, so that once the agency enters a binding agreement with a private party and the agreement itself, for whatever reason, evades judicial review, the agency's obligations under the agreement will excuse or trump the agency's ordinary statutory obligations. I would conclude that, even though the land exchange agreement was legally binding, the Park Service remained under an obligation to consider, under statutorily-specified procedures, the recreational and scenic impact of the entire interchange construction project under the National Park Service Organic Act; its conformity with the comprehensive plan under the National Capital Planning Act; its impact on the Historic District of the City of Alexandria and on the Mount Vernon Memorial Highway under the National Historic Preservation Act; and its impact on the Potomac floodplain under Executive Order No. 11,988 and the Floodplain Management Guidelines, and that by limiting the scope of its review to narrow design questions, it has breached these statutory duties.

For the foregoing reasons, I respectfully dissent.